Felicisimo N. MARTIN,
Plaintiff–Appellant,

v.

Bruce GENTILE, Detective, CID Homicide, Bureau of Investigations; Michael Ferriter, Detective, CID Homicide, Bureau of Investigations; Thomas Bruciak, Corporal, CID Homicide, Bureau of Investigations; Terry R. Eaton, Evidence Technician, CID Homicide, Bureau of Investigations; William G. Spalding, Sergeant, Emergency Services Team, P.G.C.P.; Emergency Services Team, P.G.C.P., Defendants–Appellees,

and

Lawrence Joseph Hogan, Prince George's County Executive; Donald W. Chamblee, Officer; Stanley A. Birckhead, Officer; Paul M. Mazzel, Officer; Mark Murphy, Officer, Defendants.

Felicisimo N. MARTIN,
Plaintiff–Appellee,

v.

Bruce GENTILE, Detective, CID Homicide, Bureau of Investigations; Michael Ferriter, Detective, CID Homicide, Bureau of Investigations; William G. Spalding, Sergeant, Emergency Services Team, P.G.C.P.; Donald W. Chamblee, Officer; Stanley A. Birckhead, Officer; Paul M. Mazzel, Officer; Mark Murphy, Officer, Defendants–Appellants,

and

Lawrence Joseph Hogan, Prince George's County Executive; Thomas Bruciak, Corporal, CID Homicide, Bureau of Investigations; Terry R. Eaton, Evidence Technician, CID Homicide, Bureau of Investigations; Emergency Services Team, P.G.C.P., Defendants.

Nos. 87–7113, 87–7140.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 2, 1988.

Decided June 17, 1988.

William H. Klumpp, Jr., Baltimore, Md., for plaintiff-appellant.

Michael Gerard Comeau, Associate Co. Atty. (Larnzell Martin, Jr., Co. Atty., Michael O. Connaughton, Deputy Co. Atty., Upper Marlboro, Md., on brief), for defendants-appellees.

Before HALL, PHILLIPS, and MURNAGHAN, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Felicisimo Martin brought this 42 U.S.C. § 1983 action alleging that Prince George's County, Maryland police officers violated his constitutional rights by using excessive force during his arrest and by denying him medical treatment for fourteen hours thereafter. The district court held, following a bench trial, that neither the force used to arrest Martin nor the delay in providing him medical care rose to the level of a constitutional violation. We affirm.

I

In January 1980, Prince George's County Police Department detectives Bruce Gentile and Michael Ferriter identified Martin as a suspect in a series of remarkably similar violent rapes and obtained a warrant for his arrest. Because the rapist had used a large knife in the commission of his crimes and cut several of his victims, the detectives were concerned that Martin would be armed and dangerous and likely to resist arrest. This conclusion was bolstered by the fact that Martin had a previous conviction for attempted robbery, a previous arrest for assault with a switchblade, and was believed to have some training in the martial arts. Accordingly, the detectives engaged the police department's Emergency Services Team (EST), which had special expertise in handling violent suspects, to make the arrest. The EST was commanded by Sergeant William Spalding.

The detectives briefed the EST members at length on Martin's prior history and the details of his alleged crimes, and instructed the EST to arrest Martin in his car so they could impound it for a search. To accomplish this task with a minimum of risk to the public, the EST planned to stage a fake accident in an isolated area along Martin's route to work. Several uniformed police officers in marked cruisers were to stop traffic at the scene of the "accident," while the EST members concealed themselves in the brush alongside the road. The arrest was planned for the early morning hours of January 15, 1980.

Martin's car approached the roadblock at approximately 5:30 a.m. It was still dark and visibility in the area was poor. When Martin stopped at the roadblock, the EST members charged his car, jerked open the door, and ordered him to get out with his hands up. When Martin refused to do so,[1] Officer Chamblee reached into the car, grabbed Martin by his shirt, and tried to pull him out of the car. Martin resisted, gripping tightly onto the steering wheel.

In the ensuing confusion, Sergeant Spalding rammed the barrel of a loaded shotgun through Martin's windshield, sending glass flying in all directions. Exactly what was going through Spalding's mind at the time is unclear: he has testified variously that the car lurched forward at him

---

1. Martin claims he resisted because he did not know his "attackers" were police officers. This claim is somewhat incredible, given the presence of the marked cruisers and the standard police department insignia on the EST members' uniforms.

and that he saw Martin's hand move toward the glove compartment as if to reach for a weapon. In any event, it seems clear—and the district court expressly found—that Spalding thrust the shotgun through the window in a deliberate effort to intimidate Martin.

Spalding's action was in that regard successful, for Martin released his grip on the steering wheel, and he and Officer Chamblee went tumbling out onto the road. At that point there was a scuffle of some sort. Martin claims that the officers threw him down face down on the glass-covered pavement, where he landed prone with his hands pinned beneath his body. According to him, one officer then sat on his back, while the others beat him viciously about the head and shoulders before brutally wrenching his hands from underneath his body to handcuff him. The officers' version of the incident is, not surprisingly, somewhat different. They concede that Martin landed face down on the pavement when he tumbled out of the car, and that Officer Chamblee put a knee in Martin's back to hold him down. But they deny beating Martin; they recall only that he refused to submit to handcuffing and that they had to forcibly remove his hands from underneath his body in order to do so.

At some point during this incident—which in its entirety lasted no more than two minutes—Martin sustained a cut above one eye, a puncture wound in his palm, and scrapes and bruises on his shoulders and elbows. Martin contends that he thought his elbows were broken. It is unclear whether the shotgun itself ever came in contact with Martin's person. Detective Gentile's initial report of the incident indicated that the barrel of the shotgun had struck a glancing blow to Martin's eyelid. Spalding denies this, and Martin himself testified on cross-examination that the cut above his eye was sustained during the scuffle on the ground.

Following his arrest, Martin was taken directly to an interrogation room, where he was strip-searched and interrogated for a period of approximately 14 hours. During this period, Martin complained several times about his injuries. The officers allowed him to wash off his scrapes with soap and water and cleaned the cut over his eye for him, but did not take him immediately to a doctor. Martin claims he asked several times to be taken to the hospital because he thought his elbow was broken, but was told he would not be taken until he answered a few more questions. Approximately 14 hours after his arrest, Martin finally confessed to the rapes and was taken to the emergency room for medical treatment shortly thereafter. The physician who examined him there removed a small piece of glass from his palm and bandaged the cut over his eye, but found no broken bones and no wounds requiring stitches. He testified that Martin had a few minor injuries—mostly scrapes and bruises—but that he was otherwise unharmed.[2] There is no evidence that the experience caused Martin any permanent injury or lasting effects.

Based on the confessions, the state charged Martin with eleven rapes. Martin moved to suppress the confessions prior to trial, claiming that they had been obtained by beatings, threats, and the denial of essential medical care. After a three-day hearing, the trial court ruled that the confessions had been voluntary and denied the motion to suppress. Shortly thereafter, Martin pled guilty to four of the offenses charged and was sentenced to four 50–year terms in prison.

After serving several years of his sentence, Martin brought this § 1983 action

2. As the district court noted, the doctor who examined Martin in the emergency room and testified about his injuries at trial may not have been a completely impartial witness: he had treated the victims of the rapes and knew that Martin was the man suspected of having committed them. But his testimony was corroborated by that of the magistrate who conducted Martin's probable cause hearing some four hours after his arrest. She testified that at that time Martin had no visible injuries except for a small cut above his eye, and that he did not complain about his physical condition or ask for medical treatment. Martin himself presented no medical evidence about the extent of his injuries; instead, he relied solely on the testimony of his mother and sister, a fellow inmate, and himself.

against the police officers who had participated in his arrest and interrogation.[3] In his pro se complaint, Martin alleged that the officers had deprived him of liberty without due process of law by using excessive force to arrest him and subjected him to cruel and unusual punishment by denying him medical treatment for 14 hours thereafter. The parties consented to have the case tried before a federal magistrate pursuant to 28 U.S.C. § 636(c). Prior to trial, the defendants moved for summary judgment based on collateral estoppel, contending that the constitutional issues raised in Martin's complaint had been resolved in their favor in the state suppression hearing. The magistrate denied the motion and, after a two-day bench trial, entered a verdict in favor of the defendants. The magistrate found that the force used to arrest Martin did not violate his constitutional rights, because it was not inflicted "maliciously to cause this man harm" but "in a good faith effort ... to effect a legitimate state interest—that is, to effect an arrest of a suspect in a number of heinous crimes." The magistrate also found that the 14-hour delay in providing Martin with medical care, though deliberate, did not violate his constitutional rights because he had "no serious medical need" at the time. This appeal followed.[4]

## II

We consider first Martin's excessive force claim. We note at the outset that there has been unresolved confusion throughout about the precise source of the constitutional right Martin is asserting here. His pro se complaint alleged only that the force used to arrest him "constitutes [a] violation of my Fourteenth Consti-

tutional Right." *See* Complaint ¶ 19. But the due process clause of the fourteenth amendment is the source of three distinctly different types of constitutional protection against state interference. *See Daniels v. Williams,* 474 U.S. 327, 337, 106 S.Ct. 662, 677, 88 L.Ed.2d 662 (Stevens, J., concurring). First, it incorporates against the states certain provisions of the Bill of Rights, including the fourth amendment's prohibition against unreasonable searches and seizures and the eighth amendment's ban on cruel and unusual punishment. Second, it has a procedural component that provides direct protection against state deprivation of life, liberty, or property without appropriate procedural safeguards. Third, it has a "substantive" component that forbids certain deprivations of life, liberty, or property regardless of the procedures by which they are accomplished. *Id.*

Martin's complaint does not identify which of the various constitutional protections embodied in the fourteenth amendment he intended to serve as the basis for his excessive force claim. So far as we can tell from the record, the issue of the precise constitutional right at stake was never directly addressed at trial. Instead, the claim was tried simply as one complaining of the use of excessive force in making an arrest, which is "quintessentially" one invoking the protections of the fourth amendment, the only part of the Constitution that speaks directly to seizures of the person. *See Lester v. City of Chicago,* 830 F.2d 706, 710 (7th Cir.1987); *Gumz v. Morrissette,* 772 F.2d 1395, 1404 (7th Cir.1985) (Easterbrook, J., concurring).[5]

On appeal, the defendants argue that because Martin made no specific reference to the fourth amendment in his complaint,

**3.** Also named as defendants were the Governor of Maryland and the then-Chief Executive of Prince George's County. These defendants were dismissed from the case before trial and are not a part of this appeal.

**4.** All defendants except for Officers Gentile and Ferriter, the detectives who interrogated Martin, and Sergeant Spalding, the commander of the EST that arrested him, have been dismissed from the appeal by stipulation of the parties.

**5.** In *Gumz,* the majority opinion applied the substantive due process "shocks the conscience" test to a claim of excessive force during arrest. 772 F.2d at 1400. Judge Easterbrook concurred in the judgment, but wrote separately to indicate his view that the fourth amendment, rather than substantive due process, governed all claims of excessive force in arrest. *Id.* at 1404–09 (Easterbrook, J., concurring). In *Lester,* the Seventh Circuit partially overruled *Gumz* and adopted the position outlined in the Easterbrook concurrence. 830 F.2d at 713.

his excessive force claim should be treated as one solely for violation of the substantive and procedural rights secured directly by the fourteenth amendment itself. To this there is a simple answer. Martin's complaint was filed pro se, and we are therefore obligated to construe it liberally to assert any and all legal claims that its factual allegations can fairly be thought to support. *See Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). There can be no doubt that the facts as pled by Martin—of physical brutality during the course of an arrest—are sufficient to make out a cognizable fourth amendment claim. The fourth amendment issue has been recognized and discussed by both sides on appeal. *See* Appellant's Brief at 9–10; Appellees' Brief at 12–13. Accordingly, it is the fourth amendment to which we look in assessing the validity of Martin's excessive force claim.[6]

The fourth amendment, made applicable to the states through the fourteenth, guarantees individuals the right "to be secure in their persons ... against unreasonable ... seizures." U.S. Const. Amend. IV. It is now firmly established that the fourth amendment's prohibition against unreasonable seizures protects not only against arrests without probable cause, but also against the use of excessive force in making arrests that are themselves supported by probable cause. *See Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (use of deadly force to apprehend unarmed, nondangerous felony suspect is "unreasonable seizure" within meaning of fourth amendment, notwithstanding the existence of probable cause to arrest). In *Garner*, the Court flatly rejected the suggestion that the fourth amendment's reasonableness requirement is satisfied so long as the seizure itself is supported by probable cause, holding that the reasonableness of a seizure depends not only on *when* it is made, but also on *how* it is carried out. *Id.* at 7–8, 105 S.Ct. at 1699–1700; *see also Terry v. Ohio*, 392 U.S. 1, 28–29, 88 S.Ct. 1868, 1883–84, 20 L.Ed.2d 889 (1968) ("The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all."); *Jenkins v. Averett*, 424 F.2d 1228, 1232 (4th Cir.1970) (Sobeloff, J.) (fourth amendment provides constitutional protection against use of excessive force during arrest that is vindicable through § 1983).

Determining whether the force used to carry out a particular arrest is "unreasonable" under the fourth amendment requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at 8, 105 S.Ct. at 1699 (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983), *see also Lester*, 830 F.2d at 711; *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1502 (11th Cir.1985) (en banc). The outcome of this balancing test necessarily depends on the facts and circumstances of the particular case. *Garner*, 471 U.S. at 8–9, 105 S.Ct. at 1699–1700 (question is "whether the totality of the circumstances justifie[s]

---

6. While, as noted, the magistrate did not identify the specific constitutional right he considered to be at issue, he obviously applied the more stringent "substantive due process" standard derived from *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.1973) (excessive force against pretrial detainee), which includes the subjective requirement that the police officer must have acted "maliciously" or "sadistically."

"Substantive due process," with this more stringent standard, may well exist as a residual protection against all excessive uses of physical force in whatever context, including arrest. *Cf. United States v. Robinson*, 414 U.S. 218, 236, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973) (search incident to arrest assessed under both standards); *but see Lester v. City of Chicago*, 830 F.2d at 710, 713 (all claims of excessive force in arrest should be judged under fourth amendment standard, however claim labeled).

Because, as indicated, we believe that the *pro se* complaint here must be construed to invoke the fourth amendment's express protection, we may properly apply its standard as the more favorable one whether or not it is the exclusive one for the classic arrest situation here presented. Obviously, any claim which fails under the wholly objective *Garner/Terry/Jenkins* arrest standard would also fail under the more stringent *Johnson v. Glick* substantive due process standard. *See Robinson*, 414 U.S. at 236, 94 S.Ct. at 477.

a particular sort of search or seizure"). In striking this balance, due regard must be given to the fact that police officers must make split-second judgments about the amount of force necessary to effect a particular arrest, in circumstances that are stressful and rapidly changing. *See Lester*, 830 F.2d at 712; *see also Garner*, 471 U.S. at 26, 105 S.Ct. at 1709 (O'Connor, J., dissenting).

The standard of "reasonableness" under the fourth amendment is wholly objective; the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his own subjective intent or motivation. *Scott v. United States*, 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723–24, 56 L.Ed.2d 168 (1977) (Rehnquist, J.); *see Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–80 (in assessing the reasonableness of a particular search or seizure "it is imperative that the facts be judged against an objective standard"). Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable seizure; nor will subjectively good intentions render an objectively unreasonable seizure constitutional. *Id.; see Lester*, 830 F.2d at 712; *Gumz*, 772 F.2d at 1407 (Easterbrook, J., concurring).[7]

Faithful adherence to this established fourth amendment standard of objective reasonableness when dealing with claims of the use of excessive force during arrest will not make police officers subject to § 1983 liability at one end for "every push and shove" they make nor at the other end for every serious injury they inflict during an arrest. The right to make an arrest carries with it the right to use the amount of force that a reasonable officer would think necessary to take the person being arrested into custody. *Lester*, 830 F.2d at 712. In determining what amount of force is objectively reasonable under the circumstances, due regard must be given to the fact that police officers are often forced to make split-second judgments, under tense, dangerous, and rapidly moving circumstances, about the amount of force necessary to effect a particular arrest. *Id.; see also Garner*, 471 U.S. at 26, 105 S.Ct. at 1709 (O'Connor, J., dissenting); *Gumz*, 772 F.2d at 1406 (Easterbrook, J., concurring) (under the fourth amendment reasonableness standard, "the more exigent the circumstances, the more the police can do"). Careful consideration of the exigencies of each particular arrest situation is the appropriate and effective way to ensure that police officers are not unduly inhibited in the performance of their duties by the threat of § 1983 liability.

## III

Applying the *Garner/Terry/Jenkins* standard, we conclude that the magistrate's decision rejecting Martin's claim must be affirmed. The evidence completely supports the conclusion that the officers' use of force was not objectively unreasonable under the circumstances, hence was not constitutionally excessive.

The officers here had a valid warrant for Martin's arrest. They had probable cause to believe that he had committed at least 11 rapes at knifepoint, each more violent than the one before. Based on his known prior record and his use of knives on his victims, they had reason to believe that he would be armed and dangerous. There were several of them, but they were on foot and he was in a car with its engine idling. They asked him to get out with his hands up. He refused. They tried to pull him out; he resisted violently. In the early morning darkness, Sergeant Spalding thought he saw Martin reach for a weapon. He was concerned about the safety of Officer Chamblee, who was locked in hand-to-hand struggle with Martin. Forced to make a split-second decision, Sergeant Spalding pointed the shotgun at Martin and rammed

---

7. Once it is established that a fourth amendment violation has in fact occurred, the officer's *objective* "good faith" may of course become relevant to the operation of the exclusionary rule, *see United States v. Leon*, 468 U.S. 897, 918–25, 104 S.Ct. 3405, 3418–22, 82 L.Ed.2d 677 (1984), and to the availability of the qualified immunity defense to monetary liability under § 1983. *See Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

its barrel at him through the windshield. He did not fire the weapon, nor is there any concrete finding that he ever touched Martin with it. He did, however, scare Martin sufficiently that he let go of the steering wheel and rolled out of the car. Once out on the road, Martin continued to resist. They had to subdue him forcibly to get him handcuffed, but there is no evidence of brutality aside from Martin's own memories, which are obviously colored. He had some scrapes and bruises from the scuffle, and he was no doubt put in considerable fear, but he sustained no serious injuries.

The arrest did not, to be sure, go flawlessly. As it turned out, it probably could have been accomplished with fewer officers and without ramming the shotgun through the windshield. But as Judge Easterbrook has said, "the Fourth Amendment does not require the police to use the minimum number of officers to make an arrest." *Gumz*, 772 F.2d at 1408 (Easterbrook, J., concurring). Moreover, a strong show of force, coupled with the threat to actually use it if necessary, is sometimes the safest way to ensure that a potentially volatile situation does not erupt into physical violence.[8] These officers were charged with the task of arresting a serial rapist who was known to carry knives and to use them on people, had prior arrests for violent crimes, and was actively resisting arrest. They carried it off without serious injury to him, to themselves, or to anyone else. The evidence amply supports a finding that they acted reasonably under the circumstances then confronting them.[9]

## IV

Martin's second claim is for denial of medical care following his arrest. Because Martin was a pretrial detainee and not a convicted prisoner at the time of the alleged denial, this claim is governed by the due process clause of the fourteenth amendment rather than the eighth amendment's prohibition against cruel and unusual punishment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983); *see Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright*, 430 U.S. 651, 671–72 n. 40, 97 S.Ct. 1401, 1412–13 n. 40, 51 L.Ed.2d 711 (1977) ("Eighth Amendment scrutiny is appropriate only after the state has complied with the constitutional guarantees traditionally associated with criminal prosecutions."). The due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner; while the convicted prisoner is entitled to protection only against punishment that is "cruel and unusual," the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to *any* form of "punishment." *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. at 244, 103 S.Ct. at 2983; *see Bell*, 441 U.S. at 535–37 & n. 16, 99 S.Ct. 1872 & n. 16. But not every inconvenience encountered during pretrial detention amounts to "punishment" in the constitutional sense. *See id.* at 537, 99 S.Ct. at 1873. To establish that a particular condition or restriction of his confinement is constitutionally impermissible "punishment," the pretrial detainee must show either that it was (1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate non-punitive governmental objective, in which case an intent to punish may be inferred. *Id.* at 538–40.

The due process clause may require state officials to provide medical care

---

8. Martin argues that the act of ramming the shotgun through the window served no legitimate law enforcement purpose—and was therefore per se unreasonable—because it was done solely to intimidate. We disagree. As indicated in the text, a conditional threat of force may, in certain circumstances, be a reasonable way of accomplishing an arrest without the actual use of physical force.

9. Since the force used here was not sufficiently excessive to amount to a violation of Martin's fourth amendment rights, it obviously did not violate his substantive due process rights. No suggestion of a procedural due process violation has been raised, and such a claim would, in any event, probably be barred by the availability of a state post-deprivation remedy. *See Ingraham v. Wright*, 430 U.S. 651, 674–83, 97 S.Ct. 1401, 1414–19, 51 L.Ed.2d 711 (1977).

to detainees who have been injured during the course of arrest. *City of Revere*, 463 U.S. at 244, 103 S.Ct. at 2983. While the precise scope of this obligation is unclear, we have held that a pretrial detainee makes out a due process violation if he shows "deliberate indifference to serious medical needs" within the meaning of *Estelle v. Gamble*, 429 U.S. 97, 104–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976). *Whisenant v. Yuam*, 739 F.2d 160, 163 n. 4 (4th Cir. 1984); *Loe v. Armistead*, 582 F.2d 1291, 1294 (4th Cir.1978); *accord Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir.1986) (eighth amendment's cruel and unusual punishment clause provides minimum standard for judging pretrial detainee's due process right to medical care). This is so, we reasoned, because no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent. *Whisenant*, 739 F.2d at 164.

■ Applying the *Estelle* standard, the magistrate held that the 14–hour delay in providing Martin with medical care did not violate his constitutional rights. The magistrate reasoned that although the officers had deliberately denied Martin's requests to be taken to the hospital, there was no constitutional violation because he had no serious medical needs at the time.

This critical finding that no "serious medical needs" were present is not clearly erroneous, and this disposes of the claim of constitutional violation. It is undisputed that when Martin arrived at the stationhouse he had a cut over one eye, a quarter-inch piece of glass embedded in his palm, and bruises on his shoulders and elbows. But he presented no medical evidence that these injuries were serious enough to require medical attention any earlier than he received it. The cut over his eye was small and had stopped bleeding by the time he was taken before the magistrate, largely as a result of the officers' efforts at first aid. The sliver of glass in his palm was no doubt uncomfortable, but it was not a serious injury. There is no suggestion that the delay in taking him to the hospital exacerbated his injuries in any way; indeed, the doctor who examined him in the emergency room testified that Martin's injuries were minor and did not require either stitches or painkiller. Under these circumstances, we conclude that the delay in taking Martin to the hospital, even if deliberate, did not amount to a constitutional violation under the *Estelle* standard. *Compare Cooper v. Dyke*, 814 F.2d 941, 945–46 (4th Cir.1987) (pretrial detainee raised jury question on deliberate indifference claim, where he presented medical evidence that his physical symptoms made it obvious that his gunshot wound required immediate medical attention and that the delay in providing it caused him to go into shock and suffer extensive internal bleeding).

Martin contends, however, that even if the delay in providing him medical care did not violate the *Estelle* standard of cruel and unusual punishment, it nonetheless amounts to constitutionally impermissible "punishment" under *Bell v. Wolfish*. We disagree.

There is no evidence that the delay in taking Martin to the hospital was done with a specific intent to punish. Nor was the delay sufficiently arbitrary and purposeless to support an inference that its purpose was to punish. The delay was but an incident of a legitimate governmental objective —interrogating a suspect immediately following his arrest. *Cf. Bell*, 441 U.S. at 539–40, 99 S.Ct. at 1874–75 (ensuring detainee's presence at trial is not only governmental interest that will justify conditions of pretrial detention). Had Martin's injuries required immediate medical attention, the delay in providing it might have been sufficiently excessive in relation to that objective to constitute "punishment" in the constitutional sense. But the injuries here were so minor that delaying treatment until after the interrogation session was finished simply does not rise to the level of "punishment" under *Bell v. Wolfish*. *Cf. Ingraham*, 430 U.S. at 674, 97 S.Ct. at 1414 ("There is, of course, a de minumus level of imposition with which the Constitution is not concerned.").

## V

For the foregoing reasons,[10] the judgment in favor of the defendants is affirmed.

AFFIRMED.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

Judge Phillips has written with a nice appreciation of the difficulties abundantly present in the case. He has persuaded me on the second claim. The absence of any serious medical need served to render the delay in providing treatment for an imbedded piece of glass or a cut above the eyebrow insufficient to generate a Fourteenth Amendment claim.

However, while the opinion is carefully, indeed elegantly, crafted, I find myself unable to concur in the holding that there was no Fourth Amendment violation in ramming a loaded shotgun through the windshield of the car with the predictable consequence of causing considerable fear on the part of Martin. If one took careful and premeditated aim at another, but the shot missed, at early common law there was no murder and the attempt went unpunished.[1] Here, to say that because the shotgun was not discharged there should be no recovery against the perpetrator simply does not sit well with me. Perhaps my conscience is insufficiently toughened, but, nevertheless, my conscience is disturbed. The force was unreasonable, though by good luck in this case serious physical injury did not ensue. To equate what Sergeant Spalding did here with a "push or shove" under the exigencies attendant upon the arrest strikes me as a poor analogy.

If a jury had been allowed to contemplate the circumstances and assess the damages for the constitutional violation, the factors present would, with a high degree of probability, have moderated considerably their award. The same would be true of a judge-conducted trial. To deny all chance for the judge or jury to consider a shocking abuse of power by the police demonstrates to me a suspicion of the factfinder system, whether judge or jury, that I do not share.

I respectfully dissent in part.

---

10. Because we agree with the magistrate that the defendants were entitled to judgment on the merits of both claims, we do not address the defendants' alternative contention that the judgment in their favor may be upheld on the basis of collateral estoppel.

1. The crime of attempt did not exist in early English law, which "started from the principle that an attempt to do harm is no offense." 2 Pollack & Maitland, History of English Law 508 n. 4 (2d ed. 1923). For purposes of liability under § 1983, however, it is irrelevant whether the conduct deemed unreasonable under the Fourth Amendment causes harm beyond the deprivation of rights; the degree of harm becomes relevant only in determining appropriate compensatory damages once liability is found. *See Carey v. Piphus*, 435 U.S. 247, 254–55, 266, 98 S.Ct. 1042, 1047–48, 1053, 55 L.Ed.2d 252 (1978) (absent actual injury, only nominal damages recoverable for § 1983 violation unless punitive damages awarded to deter or punish malicious deprivation of rights). Here, even though he did not suffer serious physical injuries, Martin is entitled to ask for nominal or compensatory damages for the fear and distress he suffered when excessive force was used to arrest him in violation of his Fourth Amendment rights.