Edward Arthur JONES, Plaintiff,

v.

Richard BUCHANAN, Individually and in his official capacity as Sheriff of Avery County; and Lee Keller, Individually and in his official capacity as a Deputy of the Avery County Sheriff's Department; Defendants.

No. 1:00CV-27-C.

United States District Court, W.D. North Carolina, Asheville Division.

Sept. 21, 2001.

Robert M. Elliot, Elliot, Pichko, Gelbin & Morgan, Winston–Salem, NC, Daniel A. Kuehnert, Kuehnert & Ayres, Morganton, NC, Eric R. Bellas, Morganton, NC, for plaintiff.

Elizabeth K. Mahan, McElwee & McElwee, N. Wilkesboro, NC, Douglas L. Hall, Hall & Hall, Newland, NC, Kimberly C. Stevens, Stevens & Withrow, PLLC, Winston–Salem, NC, for defendants.

## MEMORANDUM OF DECISION

COGBURN, United States Magistrate Judge.

THIS MATTER is before the court upon defendants' Motion for Summary Judgment. Having considered that motion and reviewed the pleadings, the court enters the following findings, conclusions, and decision.

### Findings and Conclusions

### I. Background

In this action, plaintiff contends that he was subjected to excessive force in violation of the fourth amendment of the United States Constitution, which is made actionable under 42, United States Code, Section 1983. Plaintiff has conceded in his response that Section 1983 is the appropriate provision to bring such a claim, making citation to other provisions surplusage. As a supplemental claim, plaintiff recasts his federal claim as a violation of parallel provisions of the Constitution of the State of North Carolina. In short, plaintiff claims that the force used by Deputy Sheriff Lee Keller in subduing him in the booking area of the Avery County Jail was excessive in

that his nose was broken. Defendants have moved for summary judgment, contending that the force used was objectively reasonable and that the broken nose was an unintentional injury incident to gaining control of plaintiff, who was highly intoxicated, belligerent, and violent at the time. Counsel for the respective parties have fully briefed the issues.

### II. Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the nonmoving party has the burden of persuasion to establish that there is a genuine issue for trial.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving [sic] party, there is no "genuine issue for trial."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted; emphasis in the original) (quoting Fed.R.Civ.P. 56). There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

By reviewing substantive law, the court may determine what matters constitute material facts. *Id.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."

*Id.*, at 248, 106 S.Ct. 2505. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> [T]he court is obliged to credit the factual asseverations contained in the material before it which favor the party resisting summary judgment and to draw inferences favorable to that party if the inferences are reasonable (however improbable they may seem).

*Cole v. Cole,* 633 F.2d 1083, 1092 (4th Cir.1980). Affidavits filed in support of defendants' Motion for Summary Judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. *United States ex rel. Jones v. Rundle,* 453 F.2d 147 (3d Cir.1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979).

## III. Undisputed Facts

The court has reviewed closely the versions of events as set forth by respective counsel in their briefs. The only dispute of fact concerns whether plaintiff's nose was broken when it came in contract with the floor of the jail or when Deputy Keller's forearm struck it when he was attempting to place a restraining hold on plaintiff. There is also a great deal of information presented by plaintiff concerning the criminal wrongdoing of Defendant Buchanan. Inasmuch as the qualified-immunity analysis makes such disputes immaterial (for the reasons discussed *infra* ), summary judgment is appropriate because no genuine issues of *material* fact remain for trial.

The following facts are undisputed and supported by uncontroverted evidence of record. Plaintiff admits that on November 3, 1999, at 8 a.m., he began drinking straight whiskey in preparation for his day of work as a carpenter. By 8:30 a.m., when a friend arrived to pick him up for work, plaintiff had consumed as much as six ounces of Canadian Mist Whiskey. During the drive to work, plaintiff had as much as another six ounces. By 10 a.m., when they arrived near the job site, plaintiff had consumed about half of a fifth of whiskey, but because it was snowing and foggy on the mountain, he and his friend decided to go hunting instead of to work.

On their way home, they stopped by the liquor store in Banner Elk and plaintiff purchased another fifth of Canadian Mist. Apparently having finished off the first fifth, plaintiff started drinking from the new bottle around noon, and relates: "I sat right there at the house and drunk almost all of it."

Realizing he had a court appearance the following day and that he was drunk, he decided he *wanted* to "just go to jail and sleep it off," even though he was in his own home. Plaintiff called 911 and said:

> Well, I am drunk and I would like for an officer to come get me and take me to jail so I can get sober.

Plaintiff avers that he could not recall what response he got from the dispatcher because, as he testified,

> "Shoot, I was pretty well drunk then. You know, I couldn't tell you exactly what he said or nothing."

Disappointed that no one had come to get him after 30 or 45 minutes, plaintiff then decided to walk to the home of some neighbors, Lake and Rose Ollis. Defendant Buchanan and Detective Pamela James arrived soon thereafter and knocked on the back door. Plaintiff was escorted to the sheriff's vehicle, where he passed out. Plaintiff does not allege any mistreatment by Defendant Buchanan during the ride to jail.

Upon his arrival at the jail, plaintiff recalled someone saying, "Get out of the car," but that he wanted to lie in the back seat and sleep instead. He further recalls that he was then "jerked" out of the car, but cannot recall who removed him from the car, what they looked like, or even what sex they were. Plaintiff, however, does not claim any injury between the car and the booking room of the jail.

When he entered the booking room, plaintiff admits he "was drunk and got to cussing" and called the officers every name he could think of because he was drunk and mad.

> I started to get mad, and when I stood up, the next thing I knowed, they knocked me down on the floor and jumped on me.

Plaintiff testified that he was feeling "pretty pissed off."

In plaintiff's version of the facts, he was on the floor and felt a knee in his back and across his neck, his nose was hurting and bleeding, and there was chaos in the jail. Plaintiff, however, cannot identify anyone who hurt him: "After I got hit, I don't remember nothing."

At the emergency room, his treating physician found that plaintiff had a 1.5 centimeter laceration of the bridge of his nose, a 1.5 centimeter laceration of the inside of the upper lip, a depressed comminuted fracture of the nasal bones, and sore ribs without a visible bruise. The blood test run by the hospital revealed that plaintiff had a blood alcohol content of .42.

Defendant Keller has also provided testimony as to what occurred on the evening in question. He admits that he broke plaintiff's nose, but states that it was accidental. At the time plaintiff arrived in booking, Deputy Keller was fingerprinting three students from Lees–McRae College so that they could engage in day care work. Plaintiff, who was nearby, began "screaming at the top of his lungs." After asking plaintiff to be quiet several times, with no positive result, Deputy Keller realized he was going to have to walk the three students past Mr. Jones to the fingerprint machine, "and I wasn't going to take them through there until we got him—either he was going to be quiet and settle down or we got him put in a holding cell or whatever."

Defendant Keller then noticed that plaintiff was lying on his back on the floor of the booking room still "yelling at the top of his lungs." (According to plaintiff's version of the facts, he was attempting to move his handcuffed hands from behind his back to in front by contorting his arms and legs.) Defendant Keller then picked plaintiff up off the floor, underneath his armpits, and sat him back in the chair. For this, plaintiff cussed Defendant Keller, "calling [him] every name in the book." Defendant Keller told plaintiff to stay in the chair, but he stood back up. Defendant Keller again asked him to sit back down, but had to push plaintiff back down "to set him in the chair." Thereafter, plaintiff got back up and took a swing at Defendant Keller, who immediately got him back into the chair. According to Keller, the following occurred:

> [I] went around the back of him and put him in a chin lock, I guess, where I come around and bring my other down to lock it where I could get control of his body. What I do is take my left arm around I guess it would be his left side and lock it on his shoulder. Then I brought my right arm down. When I brought my right arm down, my forearm caught the bridge of his nose because I heard it. I felt it hit and I heard it. I felt it crack. I didn't mean to, but it happened because I was trying to get control of him and when I come [sic] down, I locked my other arm to mine

and brought him back on in the chair and rolled him over.

Plaintiff continued to violently resist the officers, and it took four deputies to get him handcuffed and shackled. It is undisputed that plaintiff continued to be combative, even after EMS personnel arrived, and that he tried to bite one of the attendants who was attempting to help him.

Defendant Keller testified that plaintiff was "very violent, and he was strong as an ox," and that even the four officers who attempted to restrain him had difficulty.

> Then Officer Blackburn got in there trying to get [sic] help us get ahold of his hands. Then Detective James came in there trying to help us. When we got his hands finally handcuffed—and it took forever to get that other hand behind his back—he started kicking Detective James with his feet. I believe he was kicking Officer Blackburn too. I know he was kicking Pam James because I saw. So that's when we put the leg shackles on him.

Deputy Eddie Hughes also testified as to what he saw:

> He was very intoxicated. He was very strong. I was trying to, you know, help hold his legs and everything. He was incredibly strong for his size. The level of force, you know, he was pretty violent and intoxicated and, I'd say, mad probably.

Plaintiff has proffered the opinion of an expert concerning whether excessive force was used. Plaintiff's expert concluded that (1) plaintiff was uninjured when he arrived at the sheriff's department, (2) he was injured when he left the sheriff's department, and (3) therefore, there must have been excessive force.

## IV. Excessive–Force Claim

■ Under the fourth amendment, objective reasonableness provides the standard for use of force in effectuating an arrest. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Martin v. Gentile,* 849 F.2d 863 (4th Cir.1988). The test for excessive force requires "balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner, supra,* at 8, 105 S.Ct. 1694. The standard for measuring the reasonableness of an arrest is wholly objective; subjective bad intentions do not make a constitutional violation out of an otherwise reasonable seizure. *Martin v. Gentile,* 849 F.2d 863 (4th Cir.1988). The "objective reasonableness test" requires careful attention to the circumstances of the particular case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor, supra,* at 396, 109 S.Ct. 1865. The focus is on reasonableness at the moment, recognizing that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. *Id.* The analysis concerns the threat the officer perceives at the time, not what a criminal jury may find later to be proved or not proved beyond a reasonable doubt. *See Greenidge v. Ruffin,* 927 F.2d 789 (4th Cir.1991).

Maintaining order in a booking area of a county jail facility is an important governmental concern. Where, as here, noncriminal members of the public share such facility with offenders who are often violent, the importance of order and security cannot be overemphasized. The *Garner* and *Martin* decisions require this court to

focus on the perceptions of the officer at the time force was applied. Defendant Keller, as well as other officers present, have, by way of affidavits and deposition testimony, provided this court with their perceptions on the night in question. Without doubt, Defendant Keller perceived that plaintiff was belligerent, highly intoxicated, and actively disobeying commands to remain seated. In addition to the inherent threat to the safety of officers in the booking facility, Defendant Keller perceived a threat to noncustodial civilians who were also present in that room. Taking into consideration that Defendant Keller perceived a threat to himself, as well as to the college students who were present to have fingerprints taken for employment purposes, it was reasonable for him to use force to restore order in the jail facility.

It appearing that a reasonably objective officer would have perceived a need to restore order, the next issue is whether the amount of force applied was objectively reasonable. The simple act of regaining control over plaintiff, who was obviously out of control, through use of a restraining hold is patently not an excessive use of force. Even if this court were to assume that plaintiff's nose was broken when it contacted the floor—a scenario which finds no support in the medical record—that fact alone would be insufficient to overcome summary judgment. Whether plaintiff's nose was broken in a misapplied restraining hold or in a physical takedown to the floor, Defendant Keller used minimal force. The undisputed record indicates that Keller used only his hands to subdue a man he perceived to be (and testified to being) very strong, out of control, and clearly having lost command of reason. In the end, it took four officers to restrain plaintiff. During that process, and even after his arms were restrained, plaintiff brutally kicked a female deputy. Further undisputed evidence indicates that plain-

tiff's alcohol-induced aggression did not stop with law enforcement, but was extended to emergency medical personnel when he attempted to bite them. Without doubt, a reasonably objective officer would have used *at least* the amount of force employed by Defendant Keller on the night in question.

This court's analysis is consistent with well-settled law. The "objective-reasonableness standard" flows from the analysis the Supreme Court applied in *Tennessee v. Garner, supra,* wherein it held that use of deadly force by police to prevent the escape of an apparently unarmed suspected felon violated the fourth amendment. In *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court refined the standard for examining an excessive-force claim and held that Section 1983 claims against law enforcement officers for excessive force in the course of an arrest must be analyzed under the objective-reasonableness standard of the fourth amendment, as follows:

> Because "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, ..." its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight .... The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight .... The calculus of reasonableness must embody allowance of the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—- about the amount of force that is necessary in a particular situation.

*Id.,* at 396–97, 109 S.Ct. 1865. Force is not excessive if it is objectively reasonable under the circumstances facing the officer, without regard to his underlying intent. *Id.*

In a case originating in this district, *White v. Leonhardt,* 46 F.3d 1130 (table case), 1995 WL 26696 (4th Cir.1995), the Court of Appeals held that, regardless of plaintiff's version of events, a qualified-immunity inquiry (which is identical to the substantive analysis at summary judgment or trial) may be made on a claim of excessive force as early as the initial pleading stage. It need not wait for resolution of issues of fact, because the standard is based upon the officer's perception, not the plaintiff's, and how a reasonable officer would respond in such circumstances.[1]

Officer Leonhardt is entitled to immunity from liability for his use of force if a reasonable officer could have believed that White posed a threat of harm to others when Leonhardt fired. Plaintiff argues that there are various issues of disputed fact in this case that foreclose summary judgment on qualified immunity grounds.

\* \* \* \* \* \*

Plaintiff's contentions misconceive the law of qualified immunity. The immunity inquiry depends on the reasonableness of the officer's perceptions, not the plaintiff's.

*Id.,* 1995 WL 26696, at 2 (citation omitted). Indeed, other courts have found that throwing a person to the ground to subdue him, even if it results in paralysis, is not unreasonable where officers reasonably perceive a threat to their own safety or to the safety of others. *See Dyer v. Sheldon,* 829 F.Supp. 1134 (D.Neb.1993), *aff'd* 21 F.3d 432, 1994 WL 144349 (8th Cir.), *cert. denied,* 513 U.S. 970, 115 S.Ct. 440, 130 L.Ed.2d 351 (1994). Indeed, this court has held that the use of minimal force, resulting in superficial injury, to subdue a person who is intoxicated and physically resisting is objectively reasonable. *Hoover v. McDowell County,* 4:95cv182–C (W.D.N.C.1996), *aff'd* No. 96–2566(up) (4th Cir.1998).

It is well established that law enforcement officers are entitled to use the amount of force necessary to take an individual into custody. *Graham,* supra. Among the relevant factors in determining whether the officers applied reasonable force is the conduct of the arrestee. *Id.,* at 396, 109 S.Ct. 1865. The Constitution merely requires that the force used to subdue the suspect be reasonable. As the *Graham* Court reiterated, " '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." *Id.* (citation omitted). The deputy's actions must be viewed from the objective perspective of a reasonable officer on the scene "rather than with the $20/20$ vision of hindsight." *Id.* On the evening of November 3, 1999, Defendant Keller was faced with a volatile situation involving (1) a highly intoxicated individual, (2) who refused to obey lawful commands to remain seated and be quiet and (3) was actively engaged in physically resisting further detention—all (4) in the booking area of a jail facility, (5) with innocent members of the public present. Forced to make a split-second decision, Keller acted to maintain order simply by utilizing a restraining hold

---

1. For this reason, it is arguable that plaintiff's perception that his nose was broken on the floor, as opposed to Defendant Keller's fore- arm, is irrelevant. In an abundance of caution, however, the court assumed such fact as related by plaintiff.

that, through either his miscalculation or plaintiff's own resistance, caused a minor injury, for which medical attention was promptly sought. Reviewed from the perspective of a reasonable officer on the scene, and given the circumstances and the limited time in which the officer had to make a decision, his use of what, at best, can be described as minimal force, if any, to effectuate plaintiff's arrest was objectively reasonable.

Another relevant factor in determining whether the application of force was reasonable is the extent of the plaintiff's injuries. *See Pressly v. Gregory,* 831 F.2d 514, 518 (4th Cir.1987). As the medical records on the night of the incident in controversy indicate, plaintiff did not suffer injuries indicative of the use of objectively unreasonable or excessive force; rather, his injuries—small facial cuts and a nose broken in a manner consistent with an inadvertent blow—are indicative of those received by a person who has attempted to avoid arrest by engaging in a physical struggle with a deputy.

Finally, the Supreme Court said in *Graham, supra,* that a court should also consider the severity of the crime in determining the reasonableness of the force. In the case at bar, there was reason to believe that plaintiff was not only a danger to officers and the public, but also to himself, inasmuch as his 911 call was deemed to be a possible suicide threat. Given the seriousness of plaintiff's conduct, which is indicative of a person who has lost control of

reason, Defendant Keller applied a reasonable amount of force to effect plaintiff's compliance with a lawful order. The evidence indicates that Keller exercised incredible restraint in not applying greater force. Following the analysis of excessive force, as guided by the Supreme Court opinions in *Tennessee v. Garner, supra,* and *Graham v. Connor, supra,* the lawfulness of the claimed actions of Defendant Keller in effecting plaintiff's compliance is apparent. Finding that the actions of Defendant Keller were reasonable during the incident in question, the court must grant defendants' Motion for Summary Judgment on the claim of excessive force.

## V. Other Claims and Defendants

### A. Official–Capacity Claims

While not argued, it appears that plaintiff has attempted to sue the Sheriff of Avery County and his deputies in their official capacities under Section 1983. The court notes a growing dichotomy between federal and state jurisprudence in North Carolina concerning the role of a sheriff: the state courts find, with little explanation, that a sheriff and his deputies are state officials who enjoy the state's eleventh amendment immunity in Section 1983 actions;[2] while federal courts, with much explanation, find that they are local officials, who enjoy no immunity.[3] The parties have indicated to the court that they do not wish to enter the fray on such issue.[4] The undersigned is on the record

---

2. *Buchanan v. Hight,* 133 N.C.App. 299, 515 S.E.2d 225 (1999), *review denied,* 351 N.C. 351, 539 S.E.2d 280 (1999); *Messick v. Catawba County,* 110 N.C.App. 707, 431 S.E.2d 489, *disc. review denied,* 334 N.C. 621, 435 S.E.2d 336 (1993); *Slade v. Vernon,* 110 N.C.App. 422, 429 S.E.2d 744 (1993).

3. *Harter v. Vernon,* 101 F.3d 334 (4th Cir. 1996); *Knight v. Vernon,* 214 F.3d 544, 552 (4th Cir.2000); *Olvera v. Edmundson,* 151

F.Supp.2d 700 (W.D.N.C.2001); *Carter v. Barker,* 225 F.3d 653 (table), 2000 WL 1008794 (4th Cir.2000); *Ramsey v. Schauble,* 141 F.Supp.2d 584 (W.D.N.C.2001).

4. The court notes that Sheriff Buchanan was removed from office not by action of the county commissioners, but under Chapter 128–16 of the North Carolina General Statutes by a state superior court judge, in an action brought in the name of the State of

in a number of cases finding that a North Carolina sheriff is, by mandate of the North Carolina Constitution which has its origin in English common law, a representative of the state who is now elected locally. The dichotomy that is growing between the federal and state courts in North Carolina could lead to a lessening in the confidence of the judiciary for one reason: federal and state courts have concurrent jurisdiction over Section 1983 actions, and, as it now stands, a plaintiff cannot bring an action in state court against a sheriff under Section 1983, but can walk across the street and do so in the federal forum. Such issue needs resolution by either the highest state court or by legislative action. This court does not, therefore, reach such issue.

### B. Additional and Supplemental Claims

 The remainder of plaintiff's claims pivot on the substantive viability of his Section 1983 claim, which, in turn, centers on whether Defendant Keller's conduct was objectively reasonable. There being no unlawful conduct on the part of Defendant Keller, there can be no conspiracy under Section 1985, no award of fees under Section 1988, and no claim for municipal liability. Furthermore, plaintiff's supplemental state constitutional claims are coextensive and, thus, coterminus with his federal constitutional claims. In addition, plaintiff cannot avail himself of state constitutional protections where the common law has afforded him adequate remedies. *See Davis v. Town of Southern Pines*, 116 N.C.App. 663, 449 S.E.2d 240 (1994). Here, the only possible cause of

action was one for excessive force and, unlike federal law, the state constitutional claim for excessive force, if one exists, would be supplanted by a common-law claim for assault and battery.[5] For such reasons, the court will grant summary judgment on the balance of plaintiff's claims.

### C. Other Pending Motions

As a matter of housekeeping, all other pending motions (which appear to have been made in the event summary judgment was not granted) are denied without prejudice as moot.

### Decision

For the reasons discussed above, defendants' Motion for Summary Judgment (# 35) will be allowed and this action dismissed in its entirety with prejudice. All other pending motions (# 29, to compel; # 33, to disqualify; # 40, to compel; and # 50, to bifurcate) will be denied without prejudice as moot. A judgment reflecting such decision is entered simultaneously herewith.

---

North Carolina. N.C. Gen.Stat. § 128–17. *See State v. Felts*, 79 N.C.App. 205, 339 S.E.2d 99 (1986).

**5.** Even if plaintiff could show a common-law tort, "the due process clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662 88 L.Ed.2d 662 (1986).