**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1910**

JOHN DOE 4, by and through his next friend, NELSON LOPEZ, on behalf of himself and all persons similarly situated,

Plaintiff – Appellant,

v.

SHENANDOAH VALLEY JUVENILE CENTER COMMISSION,

Defendant – Appellee.

_____

CURRENT AND FORMER STATE ATTORNEYS GENERAL; ELECTED PROSECUTORS; CORRECTIONS LEADERS, CRIMINAL JUSTICE LEADERS; DISABILITY RIGHTS LEADERS,

Amici Supporting Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Elizabeth Kay Dillon, District Judge. (5:17-cv-00097-EKD-JCH)

Argued: October 28, 2020                    Decided: January 12, 2020

Before GREGORY, Chief Judge, WILKINSON, and KEENAN, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Keenan joined. Judge Wilkinson wrote a dissenting opinion.

**ARGUED:** Theodore A. Howard, WILEY REIN, LLP, Washington, D.C., for Appellant. Jason A. Botkins, LITTEN & SIPE, LLP, Harrisonburg, Virginia, for Appellee. **ON BRIEF:** Hannah E.M. Lieberman, Mirela Missova, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C., for Appellant. Joshua S. Everard, LITTEN & SIPE, LLP, Harrisonburg, Virginia; Harold E. Johnson, Meredith M. Haynes, WILLIAMS MULLEN, Richmond, Virginia, for Appellee. Neil R. Ellis, Mark E. Herzog, David A. Miller, SIDLEY AUSTIN LLP, Washington, D.C., for Amici Current and Former State Attorneys General, Elected Prosecutors, Corrections Leaders, Criminal Justice Leaders, and Disability Rights Leaders.

GREGORY, Chief Judge:

Appellants are a class of unaccompanied immigrant children detained at Shenandoah Valley Juvenile Center who challenge the adequacy of their medical care. After fleeing their native countries due to harrowing traumas, many of these children struggle with severe mental illnesses, resulting in frequent self-harm and attempted suicide. Appellants filed a class action suit alleging, among other things, that the Shenandoah Valley Juvenile Center Commission fails to provide a constitutionally adequate level of mental health care due to its punitive practices and failure to implement trauma-informed care. The district court granted summary judgment to the Commission after finding that it provides adequate care by offering access to counseling and medication.

But the district court incorrectly applied a standard of deliberate indifference when it should have determined whether the Commission substantially departed from accepted standards of professional judgment. Accordingly, we reverse and remand for further proceedings so that the court may apply the appropriate standard and consider all evidence relevant to it.

**I.**

Appellants are immigrant children who fled their native countries—mainly Honduras, Guatemala, Mexico, and El Salvador—after experiencing appalling horrors. Some have been brutally assaulted, including by their own families. J.A. 1116–17, 1128, 1246–49. Others have seen their friends and families murdered before their eyes. *Id.* All faced circumstances so dire, they were forced to flee hundreds of miles for safety.

3

Under federal law, Appellants are unaccompanied alien children ("UACs"): children under the age of 18 who have no lawful immigration status[1] and no parent or legal guardian in the United States available to care for them. 6 U.S.C. § 279(g)(2). Upon arrival in the United States, they fall under the custody of the Department of Health and Human Service's Office of Refugee Resettlement ("ORR"). 6 U.S.C. § 279(a); 45 C.F.R. § 410.207. ORR coordinates the care and placement of unaccompanied children. It is responsible for identifying qualified individuals, entities, and facilities to house them; placing children in the care of those individuals or facilities; and supervising those individuals and facilities to ensure that they provide adequate care. 6 U.S.C. § 279(b)(1)(A)–(L); 45 C.F.R. § 410.102.

Federal statute requires these children to "be promptly placed in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), and any facility housing them must be "capable of providing for the child's physical and mental well-being." *Id.* § 1232(c)(3)(A). Similarly, federal regulations state that ORR "shall hold UACs in facilities that are safe and sanitary and that are consistent with ORR's concern for the particular vulnerability of minors." 45 C.F.R. § 410.102(c). "Within all placements, UACs shall be treated with dignity, respect, and special concern for their particular vulnerability." *Id.* § 410.102(d).

---

[1] Some unaccompanied children may eventually gain lawful permanent residency through asylum or special immigrant juvenile status. *See* 8 U.S.C. §§ 1101(a)(27)(J), 1158, 1159(b); 8 C.F.R. §§ 204.11, 209.2.

**A.**

The Shenandoah Valley Juvenile Center ("SVJC") is a secure juvenile detention facility in Staunton, Virginia. J.A. 30. It is run by the Shenandoah Valley Juvenile Center Commission ("the Commission"), a governmental entity formed under Virginia law by the Cities of Harrisonburg, Lexington, Staunton, and Waynesboro, and the Counties of Rockingham, Augusta, and Rockbridge. *Id.* SVJC provides education, housing, and medical care to unaccompanied immigrant children who, in the discretion of ORR, require a secure placement due to safety concerns. J.A. 103. SVJC also houses youth from surrounding jurisdictions who have been charged with a crime but have not yet had their cases adjudicated. J.A. 125. The facility houses approximately 20 to 40 unaccompanied immigrant children at any given moment. J.A. 1599, 1650.

When a child is referred to SVJC, licensed clinicians review the child's documentation, including any case summaries, school records, disciplinary history, clinician notes, psychological evaluations, and hospitalization records. J.A. 575, 1299–1301. In some cases, clinicians reject the placement of a child at SVJC if they determine that SVJC cannot provide the necessary services for a child's mental health needs. J.A. 1302–03. If a child is accepted by SVJC, resident supervisors perform an initial intake— including a mental health questionnaire and interview—followed by an assessment by case managers and clinicians. J.A. 569–75, 1207. This assessment allows SVJC's clinicians to learn about the child's social and disciplinary history while in custody. J.A. 1301. Clinicians also learn about the child's family history and journey to the United States. *Id.*

5

After the follow-up assessment, clinicians may refer a child for evaluation by a psychologist, subject to ORR approval. J.A. 103, 1383–84, 1451.

SVJC recognizes that most of the unaccompanied children it cares for have experienced severe trauma. Its Deputy Director of Programs testified before a Senate Subcommittee on Investigations that "[t]he majority of unaccompanied children in a secure setting [such as SVJC] have histories of repeated and various forms of abuse and neglect; life-threatening accidents or disasters; and interpersonal losses at an early age or for prolonged periods of time." J.A. 1967. SVJC's lead clinician testified that "a high percentage" of the unaccompanied children at SVJC have experienced trauma, J.A. 1455, and the facility's lead case manager affirmed the "high need for mental health treatment" for the children at SVJC "given the background of these minors, what they've witnessed in [their] home countr[ies] . . . prior to undergoing a pretty traumatic journey to the United States." J.A. 1807. Around 2017, SVJC began including in its annual staff trainings a section on trauma, common traumatic experiences of resident children, and ways to engage with those suffering from trauma. J.A. 97, 190–91, 194–98, 205–06, 1192–93, 1961.

The facility also provides certain mental health services to its residents. Each resident is assigned a case manager and licensed mental health clinician.[2] J.A. 100, 881, 1064, 1853. Residents meet with their clinicians for one-on-one counseling for about an hour at least once each week. *See* J.A. 896–963. Residents can request additional visits with their clinicians, though their requests are sometimes denied or ignored. *See* J.A. 700–

---

[2] The clinicians are licensed professional counselors with master's degrees in social work, psychology, sociology, or another relevant behavioral science. J.A. 881, 1064, 1853.

01, 820–21. Besides one-on-one counseling, clinicians also lead twice-weekly, 5- to 15-minute-long group counseling sessions. J.A. 955–56, 958–59, 1055–58. Additionally, the facility has a psychiatrist, Dr. Timothy Kane, who visits the facility every three to six weeks. J.A. 1385. But Dr. Kane does not provide counseling or any form of psychotherapy—rather, he prescribes medications and offers "medication management." J.A. 822, 1324–25, 1384–85, 1480–81, 1486. Despite the services it offers, SVJC acknowledges that the facility does not have "the internal capacity to deal effectively with the needs of unaccompanied kids who have severe mental illness" because it lacks the treatment capabilities of "a residential treatment center or hospital." J.A. 1357–58. For example, it does not offer prolonged exposure therapy to treat PTSD because its clinicians are not qualified to offer such treatment.[3] J.A. 1487–88.

As a secure juvenile detention facility, SVJC also imposes various forms of discipline upon the children there. The facility's sanctions range from verbal reprimands to removal from daily programming and room confinement. J.A. 1838–37. To enforce these sanctions, SVJC permits staff to engage in the use of force, purportedly as a last resort. J.A. 163–84. Staff are authorized to apply "physical restraint techniques" to physically grab the child in a hold akin to a "full nelson." J.A. 579; *see also* J.A. 1373–74. Staff may also bind a child in handcuffs or shackles; at times, staff will place restraints onto misbehaving children, strapping them onto an "emergency restraint chair," where they

---

[3] Cognitive behavioral therapy is another common form of psychiatric treatment. When SVJC's lead clinician was asked whether any clinicians at SVJC are qualified to offer cognitive behavioral therapy, she answered, "That, I don't know. Again, we are not a therapeutic setting." J.A. 1497.

7

are trapped until they "tire themselves out." J.A. 1096, 1375–82. While Appellants initially challenged the constitutionality of these disciplinary practices on other grounds, these forms of punishment also tie into Appellants' claim of inadequate mental health care. Appellants argue that when children at SVJC act out due to untreated trauma, SVJC has shown a pattern and practice of quickly resorting to these harsh and punitive measures, re-traumatizing these children and worsening their underlying conditions. Opening Br. at 19–22, 44; *see also* J.A. 1093–94, 1101, 1107–08, 1133–37.

**B.**

John Doe 4 was born in Honduras in 2001, where he was raised by his maternal grandparents in San Pedro Sula. J.A. 1115. His father was in prison and his mother abandoned him when he was young. *Id.* As early as age seven or eight, Doe 4 saw gang members kill his friends, beating them with rocks or hacking them apart with machetes. J.A. 1116–17. When defending himself and his friends, Doe 4 was "hacked with a machete . . . and cut with a switchblade on his arm." J.A. 1117. Fearing for his life, he fled with a friend to the United States. *Id.* They journeyed through Guatemala and Mexico for a year, continuing to experience violence along the way. *Id.* Arriving in Mexico, Doe 4 was robbed, beaten, and shot in the foot, and he became separated from his friend when they fled their assailants. J.A. 1118. After recovering at a hospital, Doe 4 traveled to Mexicali. But he found no safe harbor, being beaten again when burglars robbed the house where he was living. J.A. 1118. He then went to an immigration home, where he met two others who crossed with him into the United States. *Id.* When U.S. Customs and Border

Protection officers apprehended him, they slammed his head on the ground while handcuffing him, knocking him nearly unconscious. *Id.*

Doe 4 was brought to a detention center in Southwest Key Estrella in Arizona, and later transferred to Children's Village in New York. *Id.* Due to behavioral problems,[4] he was transferred to SVJC in December 2017.[5] J.A. 896, 1119. At SVJC, Doe 4 was evaluated by Dr. Joseph Gorin, who diagnosed him with post-traumatic stress disorder (PTSD) and attention deficit hyperactivity disorder (ADHD) based upon Doe 4's clinical records. J.A. 894; *see also* J.A. 1120. Dr. Gorin also noted that Doe 4 had punched a wall at SVJC, breaking some bones, causing Dr. Gorin to consider Doe 4's "History of Self-Harm or Suicide Attempts" a "medium risk factor."[6] J.A. 891. Ultimately, Dr. Gorin recommended that Doe 4 be placed in residential treatment. J.A. 894. Despite Dr. Gorin's recommendation, and despite Doe 4's clinician continually advocating for a transfer, SVJC

---

[4] Dr. Lewis's report confirmed that at one point, however, a staff member at Children's Village physically assaulted Doe 4 without provocation. The staff member was "reprimanded and transferred to another staff secure facility." J.A. 1119.

[5] Doe 4 has since aged out of SVJC, but only after the certification of the class. *See* Resp. Br. at 12 (stating that Doe 4 arrived at SVJC in December 2017 and spent "13 months" there); J.A. 21 (certifying class in June 2018). Because "the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by [the named plaintiff]," a live controversy continues to exist, even if the claim of the named plaintiff becomes moot. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399 (1975)).

[6] Dr. Gorin stated that Doe 4 punching a wall is the "only report" of his self-harming behavior at SVJC. J.A. 891. But SVJC records demonstrate that, prior to Dr. Gorin's evaluation of Doe 4, Doe 4 tried to tie his shirt around his neck, prompting staff to place Doe 4 in a suicide vest. J.A. 1124, 1982. Because Dr. Gorin missed this fact—along with other acts of self-harm that occurred after his evaluation—the report almost certainly underestimates Doe 4's risk of self-injury.

9

did not transfer Doe 4 to a residential treatment center and stated that several centers refused to accept him due to his prior violent behavior.  J.A. 883–84; 923, 934, 939.

At SVJC, Doe 4 met with his clinician for individual counseling at least once each week.  J.A. 896–963.  He did not report suicidal thoughts in these sessions, though his clinician observed in July 2018 that Doe 4 had scabbed scratches on his arm; Doe 4 informed the clinician that he had scratched himself over the weekend out of frustration but denied having suicidal thoughts.  J.A. 947.  Doe 4 also met with SVJC's visiting psychiatrist for prescription medications.  Over the course of Doe 4's time at SVJC, the psychiatrist prescribed various ADHD medications, anti-depressants (such as Zoloft), and treatments for insomnia (such as melatonin).  J.A. 967– 98.

During his stay at SVJC, Doe 4 was involved in several major disciplinary incidents, a few involving acts of self-harm.  On December 28, 2017—less than a month after being transferred to SVJC—Doe 4 did not want to eat his dinner.  J.A. 872–73, 1124.  SVJC staff ordered him to his room several times, but he refused.  J.A. 1124.  Eventually, two staff physically grabbed Doe 4 in a full nelson hold and dragged him to his room as he kicked and struggled.  *Id.*  SVJC then confined him there.  *Id.*  While he was isolated, Doe 4 tied a shirt around his neck, causing staff to intervene and place him in a suicide blanket.  J.A. 1124, 1982.

One month later, Doe 4 was disciplined again, this time for failing to trim his nails. When an SVJC staff member ordered him to do so, and he refused, the supervisor informed

10

Doe 4 that he would "fail to earn his behavioral point"[7] for that hour. J.A. 1000. Doe 4 asked to speak with a supervisor. When the shift supervisor arrived, he told Doe 4 that he could have his behavioral point if Doe 4 trimmed his nails. *Id.* Doe 4 refused and argued with staff for several minutes before eventually punching a staff member. J.A. 1001, 2004. Staff then grappled Doe 4 in a two-person full-nelson hold before dropping him to the ground and placing him in handcuffs. J.A. 817, 1001. According to SVJC's report of the incident, "[d]ue to [Doe 4's] past history of attempted self[-]injurious behavior, his outer layer of clothing was removed to prevent him from fabricating a ligature[] or covering the window to [his room]." J.A. 2004. Doe 4 nonetheless "engag[ed] in self-harming behaviors (scratching his arms on his bunk and making marks on his wrists)." J.A. 2014.

Another incident occurred in April 2018. Doe 4 and other residents were talking to the staff about whether they had lost behavioral points. J.A. 817, 855. During the conversation, a staff member pushed Doe 4 against the wall and "said he wanted to put [Doe 4] in restraints." J.A. 817. Doe 4 asked if they could just keep talking calmly. *Id.* In response, the staff member told him to go to his room. J.A. 817, 855. Doe 4 agreed, but as he moved toward his room, a staff member punched him in the ribcage, and other staff members grabbed him, causing him to resist. J.A. 817, 1006, 1009. Staff members then twisted Doe 4's wrists behind his back, pinning him against the wall. J.A. 817. As the

---

[7] Behavioral points are accrued by each resident in SVJC for each hour of good behavior. J.A. 1097 n.10, 1191. After accumulating points, residents would gain certain privileges, such as getting the chance to spend an additional hour outside of their room before bedtime. J.A. 947. Residents can be denied behavioral points for a variety of reasons, including minor infractions. For example, Doe 4 lost behavioral points because he purportedly shared a snack with a peer. J.A. 914.

11

staff members fell upon Doe 4, he complained that he couldn't breathe. J.A. 817. "Good," staff responded. *Id.* One staff member hit Doe 4 in the face before forcing him inside his room. J.A. 1006. When staff left, Doe 4 began punching the door and sink in his room. J.A. 1004.

Other small infractions escalated into punishment or violence. Once, Doe 4 asked for deodorant, but staff members denied the request, resulting in an argument that ended with Doe 4 punching a staff member, staff members swarming him, grappling him, and restraining him with handcuffs inside his room. J.A. 768, 866–78, 1010–11. Another time, Doe 4 wanted to see his clinician. J.A. 1737–38, 1996. When a guard denied the request, Doe 4 sat in a chair, and the guard ordered him to get out. *Id.* After Doe 4 declined to do so, staff confined him to his room for six hours. *Id.*

Over the course of approximately seven months, SVJC removed him from programming approximately 21 times. J.A. 741–43. In total, Doe 4 spent 176 hours confined alone in his room. *Id.* When combined with approximately 34 days of "modified programming," in which his mobility and contact with others were severely limited, the time he spent alone or restricted from contact with others totaled over 800 hours—or more than a month. *Id.*

## C.

Other unaccompanied children at SVJC have also experienced and displayed deep distress from their severe mental health needs.[8]  Between June 2015 and May 2018, at least 45 children intentionally hurt themselves or attempted suicide.[9]  J.A. 1085–86.  John Doe 1 repeatedly cut himself and slammed his head against the wall.  J.A. 1096.  He talked about suicide on several occasions, and his clinician observed that he became "more and more frequently self-harming while at [SVJC]."  J.A. 1661.  Another child was hospitalized after he had been placed in a suicide blanket but "removed [the] strings from the blanket and tied them tightly around his neck and wrists"; thirty minutes later, he tried to drown himself in the toilet.  J.A. 1484.

A former staff member at SVJC, Anna Wykes, testified that other staff reacted with indifference when children harmed themselves.  She testified that when shift supervisors learned of a child self-harming, they responded with comments like "let them cut themselves" and "[l]et them go bleed out."  J.A. 1176, 1178.  A supervisor once "laughed in [Wykes's] face" when she reported a child's suicidal thoughts, and he refused to check on the child.  J.A. 1237.  Wykes also described a "happy-go-lucky" youth who arrived at

---

[8] The Commission argues that evidence relating to other children at SVJC is "irrelevant" because John Doe 4 must present a viable claim before the class can seek relief. Resp. Br. at 5–7.  But facts about other class members are plainly relevant to the overall class allegations, and the district court also correctly noted that "[e]vidence related to non-class members is plainly relevant to show an unconstitutional custom or practice," even if Doe 4 were raising a claim solely on his own behalf.  J.A. 805.

[9] This figure appears to include "all youth" at SVJC, not just unaccompanied immigrant children.  J.A. 1085–86.

SVJC and went "completely [] downhill." J.A. 1188–89. The youth began harming himself, "exhibiting behaviors like writing [in] his own blood." *Id.* When this same child displayed other erratic behavior, like smearing his ejaculate on his face, SVJC staff members "jok[ed] about it." J.A. 1189. She also saw staff "poking fun" at a child "sitting in [the emergency restraint] chair that he can't even move from for six hours . . . while he's [] bleeding from his arm." J.A. 1186. While Wykes testified that SVJC began implementing trauma training for staff around the time she left the facility, in her experience, "the techniques [] suggested were not implemented, and the training did not have any effect on the procedures or practices at SVJC." J.A. 1196.

Appellants' expert, Dr. Gregory Lewis, reviewed the disciplinary records for John Does 1, 2, 3, and 4 and concluded that the facility failed to treat the children there in a manner accounting for the trauma that they had experienced. J.A. 1132–36. Instead, Dr. Lewis observed that the "predominant approach utilized at SVJC is that of punishment and behavioral control through such methods as solitary confinement, physical restraint, strapping to a restraint chair, and loss of behavioral levels. These approaches are not only unsuccessful, but are extremely detrimental to detained, traumatized youth—especially UACs." J.A. 1136.

**D.**

In October 2017, Appellants filed a class action complaint on behalf of unaccompanied immigrant children detained at SVJC, naming the Shenandoah Valley Juvenile Center Commission as the sole defendant. J.A. 26. Appellants sought declaratory and injunctive relief under 42 U.S.C. § 1983, alleging that the Commission engaged in

14

unlawful patterns of conduct through: (1) excessive use of force, physical restraints, and solitary confinement; (2) failing to provide a constitutionally adequate level of care for plaintiffs' serious mental health needs; and (3) discrimination on the basis of race and national origin. J.A. 26–53.

The district court granted plaintiffs' consent motion for class certification. It defined the class as:

> Latino unaccompanied alien children (UACs) who are currently detained or will be detained in the future at Shenandoah Valley Juvenile Center who either: (i) have been, are, or will be subject to the disciplinary policies and practices used by SVJC staff; or (ii) have needed, currently need, or will in the future need care and treatment for mental health problems while detained at SVJC.

J.A. 24 (footnotes omitted). After certification, named plaintiff Doe 1—along with substitute plaintiffs Does 2 and 3—were transferred or removed from SVJC, and Doe 4 became the substituted class representative. J.A. 10. Following discovery, the Commission filed a motion for summary judgment and motions in limine to exclude Appellants' expert testimony and testimony about non-class members. J.A. 12, 787–806. At the summary judgment hearing, Appellants withdrew their claim of discrimination based on race and national origin. J.A. 762 n.3.

The court granted in part and denied in part the Commission's motion for summary judgment. Treating Appellants' solitary confinement allegation as a conditions of confinement claim, the court denied summary judgment with respect to Appellants' claims for excessive force and unconstitutional conditions of confinement, finding that both claims presented genuine disputes of material fact. J.A. 777–79. But the court granted the

15

Commission summary judgment with respect to Appellants' claim that SVJC provided inadequate mental health care. J.A. 779–81. In doing so, it applied the deliberate indifference standard, summarily stating that "courts have repeatedly applied the [] standard to civil detainees, including immigrant detainees." J.A. 779. The court then determined that the Commission did not display deliberate indifference because it provided an initial psychological evaluation that diagnosed Doe 4 with PTSD and ADHD, medication for those ailments, individual counseling, group counseling, visits by a psychiatrist at least every six weeks, and "[u]nlimited additional meetings with the psychiatrist." J.A. 781. The court also noted that while the psychologist who diagnosed Doe 4 recommended that he be placed in a residential treatment center, the court found "no indication in that recommendation that failure to secure such a placement would result in any harm or risk of harm to Doe 4." *Id.* Further, the court concluded that SVJC was not "deliberately indifferent" to the recommendation because it attempted to transfer Doe 4 to such a facility, though it was ultimately unsuccessful in doing so. *Id.*

The court also granted in part and denied in part the Commission's motions in limine to exclude expert testimony. Among other things, the court excluded Dr. Gregory Lewis's testimony about the mental health care provided by SVJC, reasoning that Dr. Lewis's testimony was "irrelevant" because the court was granting summary judgment to SVJC with respect to the adequacy of mental health services. J.A. 800. The court also stated that Dr. Lewis's opinions on SVJC's failure to apply trauma-informed care were "inadmissible because this simply is not the minimum constitutional standard." *Id.* But the court did permit Dr. Lewis's testimony "to the extent that he has opinions about harm to members

16

of the class and the cause of that harm from any unconstitutional custom or practice." J.A. 801. Similarly, the court excluded Dr. Andrea Weisman's opinions about the mental health care provided, considering it irrelevant because the court was granting summary judgment and because the court considered Dr. Weisman's testimony to be about "standards that are inapplicable to the defendant and beyond what is constitutionally required." J.A. 797.

After the court issued summary judgment, Appellants abandoned their excessive force and conditions of confinement claims. J.A. 17–18. Appellants then timely appealed the court's grant of summary judgment with respect to their claim of inadequate mental health care. J.A. 810–12.

## II.

We review the district court's grant of summary judgment de novo. *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018). Summary judgment is only appropriate when, viewing the facts in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). The Court must draw "all justifiable inferences . . . in [the nonmoving party's] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

## A.

We begin with standing. To satisfy Article III's standing requirements, a plaintiff must show that (1) it has suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v.*

17

*Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). The Commission argues that Appellants lack standing—specifically, redressability—because they did not name ORR as a defendant. According to the Commission, ORR retains ultimate responsibility for Appellants' placement and mental health treatment, and the absence of ORR means that this suit cannot redress Appellants' injuries. Resp. Br. at 17–20. Appellants answer that their injuries result from the actions of SVJC, not ORR, and that Appellants seek relief that would require SVJC to modify how it cares for those within its facility. Reply Br. at 3–5.

Appellants meet the requirements for redressability. These requirements are "not onerous." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018). Appellants "need not show that a favorable decision will relieve [their] every injury." *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)). Rather, they "need only show that they personally would benefit in a tangible way from the court's intervention." *Id.* (internal quotation marks omitted). Appellants allege that they have suffered physical and mental harm from the Commission's failure to provide adequate mental health care. To remedy these harms, Appellants seek declaratory and injunctive relief to require the Commission to implement a "trauma-informed" standard of care in its facility. Because Appellants' proposed remedy focuses on the treatment and services provided by SVJC, Appellants seek relief likely to redress their injuries.[10]

_____

[10] The Supreme Court has applied a similar principle in the context of habeas actions. In habeas "challenges to present physical confinement," the Court holds that "the immediate custodian, not a supervisory official who exercises legal control, is the proper (Continued)

18

The Commission insists that ORR retains custody and ultimate authority over mental health care for children at SVJC, pointing to the statutory and regulatory framework governing unaccompanied children, as well as the cooperative agreement between SVJC and ORR. *See* 6 U.S.C. § 279(b)(1)(A); 45 C.F.R. §§ 410.102(a), 410.207; J.A. 126, 136–38. But the Commission overstates the role of ORR in the day-to-day treatment of children at SVJC. Though ORR may be responsible for "coordinating and implementing the care and placement of UACs," ORR coordinates this care by placing children in facilities that meet minimum standards of care. 6 U.S.C. § 279(b)(1)(G)–(H); 45 C.F.R. §§ 410.102(c), 410.200–410.209. Thus, while ORR may be charged with placing children in facilities, 45 C.F.R. § 410.201, and supervising these facilities, 6 U.S.C. § 279(b)(1)(G), ORR is not responsible for directly implementing the care and treatment at the facility—that job is SVJC's. "[SVJC] must provide residential shelter and services for [UACs] in compliance with respective State residential care licensing requirements, the *Flores* settlement agreement, pertinent federal laws and regulations, and the ORR['s] policies and procedures," and "must provide . . . appropriate mental health interventions when necessary." J.A. 130; *see also Flores v. Sessions*, 862 F.3d 863, 877 (9th Cir. 2017) ("The HSA and TVPRA address ORR's obligation to provide for the welfare of unaccompanied minors, but that is not tantamount to giving the agency absolute or exclusive power over their lives while in government custody.").

---

respondent." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004); *see also United States v. Moussaoui*, 382 F.3d 453, 464 (4th Cir. 2004).

While ORR approval may be needed for SVJC to hire specialized psychiatrists or to implement particular mental health therapies, J.A. 126, 136–38, Appellants also seek forms of relief not subject to ORR approval—i.e., requiring SVJC staff to comply with the facility's own policies or changes in how SVJC's staff interact with the children in their care, such as minimizing punitive responses in favor of verbal engagement and de-escalation. *See* J.A. 1133 ("[S]taff trained in trauma-informed care rely less on the use of restraint and seclusion . . . .").

Even for the forms of relief that may require ORR approval, ORR's final authorization does not pose a barrier to redressability because ORR's actions are not wholly independent from those of SVJC. The Supreme Court held similarly in *Bennett v. Spear*, 520 U.S. 154, 159 (1997). In *Bennett*, plaintiffs were districts and ranch operators receiving water from an irrigation project, who challenged a biological opinion issued by the Fish and Wildlife Service concerning the effect of that irrigation project on endangered fish. *Id.* at 159. Like the Commission here, the Government challenged plaintiffs' standing, arguing that the challenge to the Fish and Wildlife Service's biological opinion did not redress the claimed injury because the Bureau of Reclamation "retains ultimate responsibility for determining whether and how a proposed action [on the irrigation project] shall go forward." *Id.* at 168. The Court rejected this argument. While redressability is not established if the injury complained of is the result of "*independent* action of some third party not before the court," *id.* at 169 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) (emphasis added in *Bennett*), the Court observed that the Bureau of Reclamation's action was not independent of the biological opinion, even if

20

the Bureau had final say. "[W]hile the Service's Biological Opinion theoretically serves an 'advisory function,' in reality it has a powerful coercive effect on the [Bureau]" because the statutory scheme "presupposes that the biological opinion will play a central role in the [Bureau's] decisionmaking process." *Id.* (internal citations omitted).

Here, ORR is similarly situated to the Bureau of Reclamation in *Bennett*. While it may have final say over the provision of certain medical or mental health services, its decision is not independent of that made by SVJC. For one, ORR's decision-making is limited to *approving* measures—that necessarily implies that SVJC, the proposing entity, plays the determinative role in deciding what treatment measures are proposed for implementation. *See* J.A. 1452–53 (explaining that while ORR "would have to approve a clinician's referral for a psychological evaluation," "[t]ypically, [ORR] will go with the referral of the clinician"). Additionally, ORR's approval of certain medical staff or services is necessary to ensure that unaccompanied children reside "in facilities that are safe and sanitary and that are consistent with ORR's concern for the particular vulnerability of minors." 45 C.F.R. § 410.102. Thus, Appellants' failure to name ORR as a defendant does not deprive their claims of redressability because ORR would have to approve any changes SVJC proposes to ensure that its unaccompanied children are given a constitutionally adequate level of mental health care.

The Commission also claims that Appellants lack redressability because "ORR could simply transfer class members to another facility which, like SVJC, provides mental health care and other services." Resp. Br. at 19. But Appellants do not challenge their placement in SVJC—they challenge the adequacy of the services they receive at SVJC.

21

Reply Br. at 3. Though ORR could transfer Appellants from SVJC to other facilities, a defendant cannot challenge a plaintiff's standing on the speculation that a third party might do something that affects the relief provided. *See Sierra Club*, 899 F.3d at 285 ("Just as Petitioners cannot establish redressability via speculation, NPS cannot simply hypothesize as to possible future harm to overcome the fact that a favorable ruling would redress Petitioners' only injury at this time.").

Finally, the Commission argues that "ORR's absence also means that SVJC could be subject to a court order that conflicts with its legal obligations under *Flores* and its Cooperative Agreement with ORR." Resp. Br. at 20. But the *Flores* Settlement[11] imposes a floor, not a ceiling, for the services required for children in the government's care. *See Flores*, 862 F.3d at 866. SVJC's cooperative agreement likewise exists to ensure that SVJC meets those minimum requirements. *See* J.A. 131 (requiring "appropriate mental health interventions when necessary"). Thus, neither the *Flores* Settlement nor SVJC's cooperative agreement prevent Appellants from redressing their alleged injuries through the relief they seek from SVJC.

**B.**

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility

---

[11] Reached in 1997 with the approval of a federal court, the *Flores* Settlement established a "nationwide policy" setting the "minimum standards for the detention, housing, and release of non-citizen juveniles who are detained by the government," and it requires the government to pursue a "'general policy favoring release' of such juveniles." *Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017).

for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). This includes the responsibility to provide for a person's "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200. The responsibility to provide medical care includes care for a person's mental health: "We see no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977). While a detainee's right to adequate mental health care is clear, this Court has not yet decided what standard to use to determine the adequacy of mental health care provided to a detained immigrant child.

Appellants urge us to apply *Youngberg*'s standard of professional judgment. In *Youngberg*, the Supreme Court considered the Fourteenth Amendment protections guaranteed to a mentally disabled person involuntarily committed to a state institution. The plaintiff claimed that the institution failed to provide safe conditions of confinement, unduly restricted his physical freedom, and failed to adequately train him in necessary skills. *Youngberg v. Romeo*, 457 U.S. 307, 320–23 (1982). *Youngberg* held that "liability may be imposed only when the decision by the professional" represents a "substantial departure from accepted professional judgment." *Youngberg* 457 U.S. at 320–23.

In *Patten*, this Court applied the *Youngberg* standard to an involuntarily committed psychiatric patient's claim of inadequate medical care. We concluded that there are "sufficient differences" between "pre-trial detainees" and "involuntarily committed psychiatric patients" to justify the application of *Youngberg*'s professional judgment standard for the latter. This Court explained:

23

The most obvious and most important difference is the reason for which the person has been taken into custody. . . . One of the main purposes of such commitment is, of course, to provide treatment. A pre-trial detainee, however, is taken into custody because the state believes the detainee has committed a crime, and the detainee is kept in custody to ensure that he appears for trial and serves any sentence that might ultimately be imposed.

*Patten*, 274 F.3d at 840–41 (internal citations omitted). We then offered two other reasons that justified the use of the *Youngberg* standard instead of deliberate indifference:

[P]re-trial detainees generally are housed in jails or prisons staffed by law enforcement officials, while involuntarily committed patients generally are housed in hospitals staffed by medical professionals. Finally, while some involuntarily committed patients are confined for short periods of time, many patients face lengthy and even lifelong confinement. Pre-trial detainees, however, usually retain that status for a relatively short period of time, until released on bond or until the resolution of the charges against them.

*Id.* at 841.

Applying the same analysis, we hold that the *Youngberg* standard governs this case. The statutory and regulatory scheme governing unaccompanied children expressly states that these children are held to give them care. Such children "shall be promptly placed in the least restrictive setting that is in the best interest of the child," 8 U.S.C. § 1232(c)(2)(A), and any facility housing them must be "capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). *Cf. Youngberg*, 457 U.S. at 320 n.27 ("[T]he purpose of respondent's commitment was to provide reasonable care and safety, conditions not available to him outside an institution."). When placing these children in settings that will care for them, ORR is responsible for ensuring that the children are likely to appear for any legal proceedings, protected from individuals who might victimize them, and not "likely to pose a danger to themselves or others." 6 U.S.C. § 279(b)(2)(A). To

that end, ORR "shall hold UACs in facilities that are safe and sanitary and that are consistent with ORR's concern for the particular vulnerability of minors," 45 C.F.R. § 410.102(c), and "[w]ithin all placements, UACs shall be treated with dignity, respect, and special concern for their particular vulnerability." 45 C.F.R. § 410.102(d). These duties are reflected in SVJC's cooperative agreement with ORR, which tasks SVJC with being a "care provider" that will provide children with "suitable living conditions," including "[a]ppropriate routine medical care . . . emergency health care services . . . [and] appropriate mental health interventions when necessary." J.A. 1846.

The Commission argues that this Court should (as the trial court did) apply the standard of deliberate indifference used when considering claims of inadequate medical care raised by pretrial detainees.[12] Under this standard, a plaintiff must prove: (1) that the detainee had an objectively serious medical need; and (2) that the official subjectively knew

---

[12] The dissent goes one step further, citing *Reno v. Flores*, 507 U.S. 292 (1993), to suggest that substantive due process claims by an unaccompanied child might be subject to rational basis review. But *Flores* did not go so far. In *Flores*, the Supreme Court observed that "substantive due process analysis must begin with a careful description of the asserted right." *Id.* at 302 (internal quotation marks omitted). There, the right being claimed was "the alleged right of a child who has no available parent, close relative, or legal guardian . . . to be placed in the custody of a willing-and-able private custodian rather than of [the] government[.]" *Id.* Because the Court did not consider that to be a fundamental right, the Court approved of the policy maintaining government custody as rationally connected to the government's interest in preserving child welfare. *Id.*

Here, in contrast, Appellants assert the right of unaccompanied immigrant children to receive adequate care for their serious medical needs while held by the government. The fundamental right to adequate medical care while in government custody is well established. *See, e.g.*, *DeShaney*, 489 U.S. at 199–200. The question here is therefore not whether the asserted right is supported by substantive due process, but what measurement of culpability to use to determine when an unaccompanied child has been deprived of that fundamental right.

25

of the need and disregarded it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (applying the same standard to a pretrial detainee under the Fourteenth Amendment); *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988) (same).

The Commission further argues that *Patten*'s reasoning counsels against applying *Youngberg* here. First, the Commission claims that children are placed in SVJC primarily for security reasons, not for treatment. Resp. Br. at 23 (citing 45 C.F.R. § 410.203(a)). But this argument presents a false binary. In *Youngberg*, the plaintiff was likewise institutionalized because his mother could not "control his violence." *Youngberg*, 457 U.S. at 309. Yet, the need to institutionalize the plaintiff for security reasons did not undermine the fact that he also needed to be committed for treatment. The Supreme Court explained that "the purpose of respondent's commitment was to provide reasonable care *and* safety"—making plain that the two purposes are not mutually exclusive. *Id.* at 320 n.27 (emphasis added). Indeed, the aims of treatment and safety are intertwined in this case. If a child is held at SVJC until he no longer behaves aggressively, and this aggressive behavior arises from an underlying traumatic condition, then it follows that SVJC's efforts to improve a child's behavior should also treat the child's underlying trauma that gives rise to the misbehavior. *See, e.g.*, J.A. 1967 ("For unaccompanied children, [their history of trauma] often plays a role in the legal and behavioral problems that bring them in contact with . . . secure placement.").

Similarly, the Commission contends that children are not placed at SVJC for treatment because they are "not placed at SVJC upon the advice of a medical professional."

26

Resp. Br. at 24. But the record shows that licensed mental health professionals do provide input on whether a child is placed at SVJC. SVJC's mental health clinicians evaluate prospective referrals to see if their facility can meet those children's mental health needs, and they may decline to accept a child if they determine that SVJC's services provide inadequate treatment. J.A. 1301–03. By explicitly accounting for the mental health needs of the children it accepts, SVJC's intake process confirms its intent to treat those needs for children in its care.

Next, the Commission argues that *Youngberg* does not apply because SVJC is a juvenile detention center, not a hospital or therapeutic setting. Resp. Br. at 25. But the nature of the facility is not dispositive. In *Matherly v. Andrews*, we applied the *Youngberg* standard to a person involuntarily committed to a prison for a program designed to treat his dangerousness as a sexual offender. 859 F.3d 264, 274–75 (4th Cir. 2017). The nature of the facility is secondary to the reason a person is confined in it.

The Commission also argues that children are not placed in SVJC for treatment because the children placed there are released[13] based on criteria unrelated to treatment.

---

[13] Both parties also discuss the length of detention as a factor relevant to determining whether *Youngberg* should apply. *See* Resp. Br. at 26, 30; Reply Br. at 12. While *Patten* did discuss the length of detention to distinguish individuals involuntarily detained at a psychiatric hospital from pretrial detainees, the length of detention does not necessarily distinguish psychiatric detention from other forms of civil detention, such as immigration detention. "[S]ome involuntarily committed patients are confined for short periods of time." *Patten*, 274 F.3d at 841. And some immigrant detainees are confined for long periods of time. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 860 (2018) (Breyer, J., dissenting) (observing that suit was brought by class of immigrants held for an average of one year in detention); *see also* Reply Br. at 12 (noting that Doe 4 spent about 13 months in SVJC).

27

But the regulations and cooperative agreement cited by the Commission do consider the child's health and treatment needs in determining whether a child should be released. ORR must review each child's placement every month "to determine whether a new level of care is more appropriate," 45 C.F.R. § 410.203(c), and ORR must make that decision in light of the child's "age and special needs." *See* 45 C.F.R. § 410.203(c)–(d). Meanwhile, SVJC's cooperative agreement requires it to house the children "until they are released to a sponsor, obtain immigration legal relief, age out, or are discharged by the Department of Homeland Security," but it states in the very same sentence that it does so "taking into consideration the risk of harm to the [child] or others." J.A. 127–28; *see also* 45 C.F.R. § 410.301(a) ("ORR releases a UAC to an approved sponsor without unnecessary delay, but may continue to retain custody of a UAC if ORR determines that continued custody is necessary to ensure the UAC's safety or the safety of others . . . ."). These conditions reinforce the conclusion that mental health treatment is a primary objective for the traumatized youth placed at SVJC.

Finally, the Commission asks this Court to follow other circuits that have treated immigrant detainees as equivalent to pretrial detainees, applying the deliberate indifference standard. *See* Resp. Br. at 22–23 (collecting cases). But those cases all dealt with adults detained for enforcement proceedings such as removal. *See, e.g.*, *E. D. v. Sharkey*, 928

28

F.3d 299, 306–07 (3d Cir. 2019). None dealt with unaccompanied immigrant children, whom the Government holds for the purpose of providing care.[14]

Notably, neither the Commission nor the district court grapple with the fact that this case is about children. The Supreme Court has long recognized that children are psychologically and developmentally different from adults, so much so that in the context of sentencing, "children are constitutionally different." *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *see also, e.g.*, *Graham v. Fla.*, 560 U.S. 48, 67–75 (2010); *Roper v. Simmons*, 543 U.S. 551, 569–75 (2005); *Johnson v. Texas*, 509 U.S. 350, 367 (1993); *Eddings v. Oklahoma*, 455 U.S. 104, 115–16 (1982). "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage." *Eddings*, 455 U.S. at 115. "It is the interest of youth itself, and of the whole community, that children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed" individuals. *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944). Given "the peculiar vulnerability of children," *Bellotti v. Baird*, 443 U.S. 622, 634 (1979), this Court has likewise recognized the state's strong interest in "protecting the youngest members of society from harm." *Schleifer by*

---

[14] The Commission does point to two criminal detention cases involving children where the courts did not invoke *Youngberg*. *See* Resp. Br. at 31–32 (citing *A. M. v. Lucerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572 (3d Cir. 2004); *A.J. by L.B. v. Kierst*, 56 F.3d 849 (8th Cir. 1995)). But neither case involved unaccompanied immigrant children. Further, *A.J. by L.B.* stated that it "cannot ignore the reality that assessments of juvenile conditions of confinement are necessarily different from those relevant to assessments of adult conditions of confinement." 56 F.3d at 854. And while *A.M.* applied the deliberate indifference standard, it did so without any analysis addressing the propriety of the standard in a case involving children. 372 F.3d at 587–88.

*Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998). These concerns are echoed in the regulatory scheme, which requires unaccompanied children to be treated with "special concern for their particular vulnerability." 45 C.F.R. § 410.102(c)–(d). Thus, the *Youngberg* standard is particularly warranted here, given the unique psychological needs of children and the state's corresponding duty to care for them.

Accordingly, we hold that a facility caring for an unaccompanied child fails to provide a constitutionally adequate level of mental health care if it substantially departs from accepted professional standards. To be clear, this standard requires more than negligence. "[E]vidence establishing mere departures from the applicable standard of care is insufficient to show a constitutional violation[.]" *Patten*, 274 F.3d at 845. The evidence must show "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. Under this standard, courts do not determine the "correct" or "most appropriate" medical decision. *Patten*, 274 F.3d at 845 (internal citation and quotation marks omitted). "Instead, the proper inquiry is whether the decision was so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." *Id.* (internal citation and quotation marks omitted). By applying this standard, a court "defers to the necessarily subjective aspects of the decisional process of institutional medical professionals and accords those decisions the presumption of validity due them." *Id.* Nonetheless, a decision earns this deference only if it reflects an actual exercise of medical judgment. *See Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

We have not yet explained the precise difference between the standards of professional judgment and deliberate indifference. *See Patten*, 274 F.3d at 843 (declining to determine "how far the professional judgment standard falls from negligence on the culpability continuum"); *see also Bowring*, 551 F.2d at 48 (applying the standard of deliberate indifference to a prisoner's claim of inadequate psychiatric care yet stating that the issue "remains a question of sound professional judgment"). But one difference between the two standards is that *Youngberg* does not require proof of subjective intent. *Compare Youngberg*, 457 U.S. at 323 *with Farmer*, 511 U.S. at 837. *See also* Rosalie Berger Levinson, *Wherefore Art Thou* Romeo: *Revitalizing* Youngberg*'s Protection of Liberty for the Civilly Committed*, 54 B.C. L. Rev. 535, 557, 570–574, 577 (2013) (describing *Youngberg* as an "objective standard" and "objective test"). Thus, the standard of professional judgment presents a lower standard of culpability compared to the Eighth Amendment standard for deliberate indifference.

*De'lonta I* and *De'lonta II* offer further guidance for determining when a defendant has adequately exercised professional judgment. In *De'lonta I*, a transgender prisoner with gender identity disorder ("GID") brought a § 1983 action alleging that the Virginia Department of Corrections ("VDOC") failed to adequately care for her serious mental health needs. *De'lonta v. Angelone*, 330 F.3d 630, 631 (4th Cir. 2003) ("*De'lonta I*"). The district court granted the prison officials' motion to dismiss the complaint, viewing the suit as "nothing more than a challenge to the medical judgment of VDOC doctors." *Id.* at 634–35. We reversed the district court's dismissal. Though a VDOC doctor wrote a memorandum stating that he did not believe referral to a gender specialist for hormone

31

therapy to be a "medical necessity," the doctor forwarded the request to VDOC's chief physician for review, and the chief physician's response revealed that the officials did not professionally determine whether the treatment was medically necessary:

> Dr. Smith's response to the memo, which states that there was no gender specialist at MCV and that VDOC's policy is not to provide hormone therapy to prisoners, supports the inference that Appellees' refusal to provide hormone treatment to De'lonta was based solely on the Policy rather than on a medical judgment concerning De'lonta's specific circumstances.

*De'lonta I*, 330 F.3d at 635. Even applying the higher standard of deliberate indifference, this Court noted that a defendant is required to decide treatment based on a medical judgment concerning the individual's specific needs, not based on policy or what services were ordinarily offered at the facility. *See also Jackson v. Lightsey*, 775 F.3d 170, 179 (4th Cir. 2014) ("[F]ailure to provide the level of care that a treating physician himself believes is necessary . . . clearly present[s] a triable claim of deliberate indifference").

In *De'lonta II*, the same prisoner once again challenged the adequacy of her care. *De'lonta v. Johnson*, 708 F.3d 520, 522 (4th Cir. 2013) ("*De'lonta II*"). Though VDOC provided regular psychological counseling, hormone therapy, and permitted the prisoner to dress and live as a woman to the full extent permitted in prison, the inmate still reported powerful urges to self-mutilate and self-castrate, and she was hospitalized after attempting to do so. *Id.* This time, she challenged VDOC's refusal to allow her consultation for sex reassignment surgery. *Id.* Again, the district court granted VDOC's motion to dismiss— and again, this Court reversed. When determining whether the inmate plausibly alleged that VDOC acted with deliberate indifference, this Court relied upon the "Benjamin Standards of Care," the standards "published by the World Professional Association for

32

Transgender Health" laying out the "generally accepted protocols for the treatment of GID." *Id.* at 522–23. These standards established a "triadic treatment sequence" of: (1) hormone therapy; (2) real-life experience living as a member of the opposite sex; and (3) sex reassignment surgery. *Id.* at 523. Although VDOC met the first two parts of the Benjamin Standards, "provid[ing] De'lonta with *some* treatment consistent with the GID Standards of Care," we held that "it does not follow that they have necessarily provided her with *constitutionally adequate* treatment." *Id.* at 526 (emphasis in original). While a detainee "does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *Id.*; *see also De'lonta I*, 330 F.3d at 635 (holding that the plaintiff plausibly alleged a claim for inadequate treatment, even though she "received counseling and anti-depressants"). Though we did not decide *De'lonta II* on the merits, we declined to dismiss the prisoner's claim as a matter of law simply because the prison provided some form of treatment. *Id.*

To apply *Youngberg* to a claim of inadequate medical care, then, a court must do more than determine that some treatment has been provided—it must determine whether the treatment provided is adequate to address a person's needs under a relevant standard of professional judgment.

## C.

Having determined that the *Youngberg* standard applies to Appellants' claim, we now consider whether trauma-informed care represents a relevant standard of professional judgment. A trauma-informed system of care is one that "provide[s] an environment in

33

which youth feel safe, are assisted in coping when past traumatic experiences are triggered, and in which exposure to potentially retraumatizing reminders or events is reduced." J.A. 1132. Implementing a trauma-informed system would require:

> appropriate trauma-informed policies and procedures; appropriate methods of screening, assessing, and treating traumatized youths; culturally sensitive, trauma-informed programs that strengthen the resilience of youth; and culturally sensitive, trauma-informed staff education and training.

*Id.* Dr. Lewis also states that a trauma-informed approach has three implications: (1) "appropriate [clinical or therapeutic] interventions," (2) "a more global or systems perspective" to consider less restrictive alternatives to detention,[15] and (3) staff "rely[ing] less on the use of restraint and seclusion." J.A. 1132–33; *see also* Reply Br. at 14 n.8 (stating that, in addition to clinical care, a trauma-informed approach "must ensure that non-clinical staff respond to children's behavior in a way that does not inflict additional psychological damage").

The Commission claims that trauma-informed care represents an aspirational standard, not an accepted standard of professional judgment.[16] Resp. Br. at 38–41. The

---

[15] Appellants do not appear to challenge the decision to place children in SVJC. *See* Reply Br. at 3–5 (stating that Appellants "seek declaratory and injunctive relief that would require SVJC to modify its conduct to satisfy constitutionally adequate standards. Appellants have [not] alleged that ORR violated their rights by transferring them to SVJC").

[16] The Commission suggests that this Court should look instead to the requirements set by the Flores Settlement for the minimum standards of care. Resp. Br. at 40–41. But the Flores Settlement requires facilities to provide "appropriate mental health interventions when necessary" without defining when interventions are "appropriate" or "necessary." Flores Settlement, Ex. 1 at ¶¶ A.2., A.7. The Flores Settlement's minimum standards do not set out an alternative standard of psychiatric care.

34

district court's order on the Commission's motions in limine suggests that it thought the same.  First, both the court and the Commission claim that trauma-informed care "has only been implemented in a handful of states, including Missouri, New York, Ohio, North Carolina, and Kentucky."  J.A. 800.  But they misread Appellants' supplemental expert report, which lists those five states as examples, not as an exhaustive set.  J.A. 557 n.2 ("*For example*, Missouri implemented . . . .") (emphasis added).  On appeal, Appellants and *Amici* cite seven additional states as further examples.  Reply Br. at 15 n.9 (citing West Virginia and Wisconsin); Br. of Current and Former State Attorneys General, Elected Prosecutors, and Corrections, Criminal Justice, and Disability Rights Leaders, as *Amici Curiae* Supporting Appellants 12 (hereinafter "Br. of Criminal Justice and Disability Rights *Amici*") (citing California, Florida, Massachusetts, Connecticut, and Pennsylvania).  Second, the district court cited *Willis v. Palmer* to conclude that trauma-informed care is "cutting edge" rather than well established.  No. C12-4086, 2018 WL 3966959, at *12 (N.D. Iowa Aug. 17, 2018).  But *Willis* holds little weight because the report it cited described trauma-informed care as "cutting edge" with respect to treatment of sex offenders, not to the treatment of children.  *Willis*, 2018 WL 3966959, at *12.

For children, "[t]rauma-informed care is already in widespread use in juvenile detention systems and is considered the accepted standard of professional care."  Br. of Criminal Justice and Disability Rights *Amici* at 12; *see also* J.A. 1131.  The Department of Justice considers trauma-informed care to be an appropriate standard for juvenile justice, *see* U.S. Dep't of Justice, Report of the Attorney General's National Task Force on Children Exposed to Violence (2012), https://perma.cc/G3F6-ACW2 (saved as

ECF opinion attachment), and multiple national organizations endorse trauma-informed care as a governing professional standard for children in detention, including the Substance Abuse and Mental Health Services Administration, the National Council of Juvenile and Family Court Judges, and the National Center for Mental Health and Juvenile Justice. *See, e.g.*, Elizabeth Stoffel, *et al.*, *Assessing Trauma for Juvenile and Family Courts*, Nat'l Council of Juv. & Fam. Ct. Judges (2019), https://perma.cc/K3SZ-V62X (saved as ECF opinion attachment); Nat'l Ctr. for Mental Health & Juv. Just., *Strengthening Our Future: Key Elements to Developing a Trauma-Informed Juvenile Justice Diversion Program for Youth with Behavioral Health Conditions* (2016), https://perma.cc/4LZ4-BE7M (saved as ECF opinion attachment).

We leave it to the trial court to determine in the first instance to what extent, if any, the trauma-informed approach should be incorporated into the professional judgment standard in this particular case. We observe only that trauma-informed care is part of the landscape of relevant evidence to be considered by the trial court in making this determination.

## D.

We now turn to whether summary judgment was appropriate. Because the *Youngberg* standard governs Appellants' claim, the district court erred by applying the standard of deliberate indifference. In doing so, the district court also excluded evidence relevant under *Youngberg*, including Dr. Lewis's opinions concerning trauma-informed care and Dr. Weisman's opinions which were not presented as part of the record on appeal. J.A. 795–801.

36

Moreover, the district court misread the record and failed to construe it in the light most favorable to the nonmoving party.[17] The court justified summary judgment in part because it did not consider Doe 4 to be at risk of serious harm. It reasoned that Doe 4 did not need additional psychiatric care[18] because he "admits that he never thought of committing suicide, that he had no thoughts of self-harm, and that the only incident where he harmed himself was when he punched a wall in anger." J.A. 781. But SVJC's own records contradict this. They show that Doe 4 once attempted suicide when he tied a shirt around his neck, causing staff to intervene and place him in a suicide vest. J.A. 1124, 1982. A month later, Doe 4 "engag[ed] in self-harming behaviors (scratching his arms on his bunk and making marks on his wrists)." J.A. 2014. This prompted SVJC staff to comment

---

[17] The dissent accuses the majority of "cherry-picking the testimony it likes from the record," specifically claiming that the majority privileges Dr. Lewis's testimony over Dr. Kane's. It is unclear how the dissent comes to this conclusion, as we cite Dr. Lewis's testimony only to define the standard of trauma-informed care proposed by Appellants and to say that this testimony could be relevant under *Youngberg*.

The dissent also neglects the standard governing summary judgment. Here, we must read the record in the light most favorable to Appellants, the non-moving party. Fed. R. Civ. Proc. 56(a). The dissent does the opposite. To the extent the dissent believes there to be contrary facts in the record—for example, whether Dr. Kane's role was limited to medication management or whether his conversations with Appellants had actual therapeutic value, see Dissenting Op. at 56–57—the dissent simply raises disputes of material fact. Where such disputes arise, summary judgment is inappropriate.

[18] The Commission similarly argues that Doe 4 received adequate care because he "improved" during his time at SVJC. Resp. Br. at 13, 43. To support this claim, it cites Doe 4's self-report to Dr. Gorin during his psychological evaluation, one month after he arrived at SVJC. But the record also shows that, after the evaluation, Doe 4 continued to suffer disciplinary incidents and engage in self-harm throughout his time at SVJC. J.A. 768, 866–78, 947, 1010–11, 2004, 2014. The Commission also cites Doe 4's deposition testimony, but that testimony referred to his anger, not to his PTSD or to his treatment at SVJC. J.A. 872–73. At best, this presents a dispute of material fact.

37

about Doe 4's "past history of attempted self[-]injurious behavior" and to remove "his outer layer of clothing . . . to prevent him from fabricating a ligature[] or covering the window to [his room]." J.A. 2004. After seven months in SVJC, Doe 4's clinician observed that Doe 4 had "superficial scabbed scratches" on his arms, and Doe 4 reported that he had used his own fingernail to cut himself over the weekend out of frustration. J.A. 947. While Doe 4 testified that he did not recall thoughts or attempts at suicide or self-harm, he also admitted that he sometimes "couldn't remember the things [he] did when [he] was angry." J.A. 872–73.

The district court also did not construe the record in the light most favorable to Appellants when describing the adequacy of existing services at SVJC. The court stated that Doe 4 "saw a psychiatrist at least every six weeks," and that "[m]ore than fifty percent of each visit with Dr. Kane is supposed to be dedicated to one-on-one counseling." J.A. 781. But the Commission's witnesses, including Dr. Kane, testified that he did not provide counseling or therapy and that he was charged solely with prescribing and managing medications. J.A. 822, 1324–25, 1384–85, 1480–81, 1486.

The district court did acknowledge that Dr. Gorin had diagnosed Doe 4 with PTSD and recommended that Doe 4 receive treatment in a residential treatment center.[19] J.A. 894. Doe 4's clinicians likewise advocated on his behalf for placement in such a center.

---

[19] The Commission argues that Dr. Gorin's diagnosis was limited because "Doe 4 provided inconsistent responses and refused to provide information characterized as 'very important' by [Dr. Gorin]." Resp. Br. at 49. But this merely challenges the weight of Dr. Gorin's diagnosis and recommendation. This presents a dispute of material fact best resolved at trial.

J.A. 883–84; 923, 934, 939. But the court satisfied itself with the fact that SVJC had attempted to transfer Doe 4 to such a facility, J.A. 781, without assessing whether SVJC's services were adequate for Doe 4 once they were unable to do so. Consequently, the court did not consider testimony by SVJC's staff recognizing that they lacked the capacity to treat children whom psychologists recommended for placement in residential treatment. J.A. 1324 (testifying that "if a child needs to be sent to a residential treatment center" but cannot be placed there because "a secure option is not available," such situation presents "a conundrum that's problematic"); J.A. 1357–58 (testifying that SVJC does not have "the internal capacity to deal effectively with the needs of unaccompanied kids who have severe mental illness" because it lacks the treatment capabilities of "a residential treatment center or hospital"). In light of the *Youngberg* standard, the district court must consider this evidence and all other evidence relevant to the professional standards of care necessary to treat Appellants' serious mental health needs.

## III.

For all of these reasons, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

WILKINSON, Circuit Judge, dissenting:

We judges should stick to what we are good at: applying precedent, interpreting statutes, and exercising traditional equitable powers. Today's case features an invitation to try our hand at institutional governance and to do something we are utterly unqualified to do—determine what constitutes acceptable mental health care. I respect the majority's sincere and humane concerns. But it is staring at a host of unintended consequences. And under what rock is hidden its holding's relationship to law, I have no idea.

Juvenile detention is a tricky business. That is especially true for facilities like appellee Shenandoah Valley Juvenile Center (SVJC), which is specifically designed to house youths too dangerous to be safely housed elsewhere. *See* 45 C.F.R. § 411.5 (defining a "secure facility," like SVJC, "as the most restrictive placement option for [an alien minor] who poses a danger to him or herself or others or has been charged with having committed a criminal offense"). In addition to this difficult charge, SVJC provides its detainees with living accommodations, food, clothing, routine medical and dental care, weekday classroom education, recreation, individual and group counseling sessions, and access to religious services. Appellants have abandoned any challenge to those conditions in this case. Maj. Op. at 21-22. As discussed in Part II, SVJC also provided substantial mental health services to appellant Doe. But SVJC concedes it is not designed to be a mental health treatment center. It prioritizes detainee safety and controlling violent behavior because its residents are dangerous.

The majority has effectively ordered an overhaul of SVJC's very nature from the bench, reasoning that the Constitution somehow—without any textual hook—requires

40

SVJC to focus on treating the underlying traumas of its residents instead of controlling dangerous behaviors. The majority sees these two things as related, and to some extent they may be. But treatment is a patient long-term project and SVJC faces the urgent short-term task of simply ensuring the safety of those who reside there.

The majority prioritizes its view of what SVJC should be by adopting the professional judgment standard, a loose substantive due process doctrine that has never been expanded to juvenile detention by the Supreme Court, the Fourth Circuit, or any other court of appeals. In the process, the majority establishes the judiciary as the new overseer of mental healthcare in all juvenile detention facilities. The majority pretends to adopt a posture of deference toward SVJC's treatment regimen, but its remand wholly belies that claim. Maj. Op. at 36-39. The majority asserts that trauma-based treatment is only one of many mental health options for the facility, Maj. Op. at 33-36, but its opinion and appendices make clear it is the sole option that has any realistic chance of meeting with the majority's favor. After the Supreme Court rejected decades of judicial attempts to micromanage the nation's prisons and schools, it is startling that the majority opens up a new front of judicial institutional supervision over mental healthcare in juvenile detention systems.

By adopting the more intrusive professional judgment standard, the majority also creates a circuit split. *See A.M. v. Luzerne Cty. Med. Ctr.*, 372 F.3d 572, 579 (3d Cir. 2004). After discussing the realities of the institutional context and recognizing the need for deference, the Third Circuit adopted a deliberate indifference standard for claims by

juvenile detainees. *Id.* at 579-80. Under this standard, only reckless disregard of a serious medical need is actionable. *Id.* at 579.

We deal here with practical possibilities, not judicial wish lists. And even under the majority's erroneous legal standard, the proper course is to affirm. Although the professional judgment standard expands the role of the courts in overseeing mental healthcare in juvenile detention centers, it was still, until now, an exceedingly deferential test. Doe received mental health care treatment from several medical professionals of unquestioned qualifications. Those professionals diagnosed him with psychological disorders, prescribed him medication for those maladies, and focused on controlling Doe's violent behavior. Doe even testified that the course of treatment was successful in reducing his problems with anger management. J.A. 873. By remanding in the face of this record, the majority urges courts to enter the business of second-guessing mental health treatment decisions. Because we are not remotely qualified to do that, I respectfully dissent.

I.

A.

The proper standard of review is crucial here if the role of courts in institutional governance is ever to be cabined. The majority's adoption of the professional judgment standard to adjudicate claims of inadequate mental healthcare by juvenile detainees is foreclosed by precedent and finds no support in written law. Instead, as I have noted, the majority expands substantive due process, needlessly creates a circuit split, and embarks upon an unchartered course.

"As a general matter, a State is under no constitutional duty to provide substantive services for those within its borders." *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982). There are only limited exceptions to this rule. The Eighth Amendment obligates the States to provide medical care to prisoners. *See Farmer v. Brennan*, 511 U.S. 825 (1994). We have held that the Due Process Clause's substantive component requires the government to provide basic medical care to pretrial detainees. *See Martin v. Gentile*, 849 F.2d 863, 870–71 (4th Cir. 1988). In all these instances, we have shown great deference to the government's choices in how it provides medical care to those in its custody. We review such claims only for deliberate indifference to serious medical needs. *See id.* (discussing pretrial detainees). Successful claims under this standard require showing either that prison officials recklessly ignored a serious problem or provided treatment that was utterly unreasonable. *Farmer*, 511 U.S. at 834. This "very high" bar is rarely met. *Young v. City of Mount Ranier,* 238 F.3d 567, 575 (4th Cir. 2001).

The Supreme Court articulated a less deferential standard of review for the provision of medical services in only one case. In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Court considered a claim by a "profoundly retarded" individual who was involuntarily institutionalized by the State because he was unable to care for himself. *Id.* at 309–10. That individual was injured on at least sixty-three occasions while in the State's care, and it was alleged that the State's doctors were not taking steps to prevent such injuries. *Id.* at 310–11. Explaining that "when a person is institutionalized—and wholly dependent on the State," the Court held that "a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and

43

scope of its responsibilities." *Id.* at 317. The Court thus established the professional judgment test, which "only requires that the courts make certain that professional judgment in fact was exercised" and does not permit "courts to specify which of several professionally acceptable choices should have been made." *Id.* at 321.

The Supreme Court has never expanded the professional judgment standard beyond the strict confines of *Youngberg*. This is not surprising. Since *Youngberg* was decided, substantial doctrinal shifts have occurred in constitutional law. To start, the Court has expressed anxiety about expanding the scope of substantive due process. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("[W]e have always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." (internal quotation marks omitted)). Further, the Court has generally cracked down on attempts by courts to supervise and micromanage conditions at various institutions, including prisons and schools. *See* Douglas Laycock & Richard L. Hasen, Modern American Remedies: Cases and Materials 323–26 (5th ed. 2019).

In fact, the Supreme Court has already held that substantive due process claims by unaccompanied alien minors should be reviewed under the even more deferential rational basis test. In *Reno v. Flores*, 507 U.S. 292 (1993), the Court considered substantive due process claims asserting a right to be released from custodial detention brought by unaccompanied alien minor children in the juvenile detention system. The Court reviewed and rejected these claims under the rational basis test. *Flores*, 507 U.S. at 303 (rejecting claims because government policy was "rationally connected to a governmental interest in

44

preserving and promoting the welfare of the child and is not punitive since it is not excessive in relation to that valid purpose." (internal quotation marks and citation omitted). Even more to the point in this case, the Court rejected a proposed "best interests of the child" test to review government decisions regarding the children in its care, explaining that the standard was unworkable and not required by the Constitution. *Id.* at 304 (explaining that juvenile institutions "are not constitutionally required to be funded at such a level as to provide the *best* schooling or the *best* health care available"). The rational basis test "demands no more than a 'reasonable fit' between governmental purpose . . . and the means chosen to advance that purpose." *Id.* at 305. Thus, the level of deference owed to government actions under rational basis doctrine reinforces plainly the deference owed institutions under the deliberate indifference test. *See* Mario L. Barnes & Erwin Chemerinsky, Essay, *The Once and Future Equal Protection Doctrine?*, 43 Conn. L. Rev. 1059, 1077 (2011) (explaining that government actions reviewed under the rational basis test are "overwhelmingly likely to be upheld" because of the deference courts must give them). Whether rational basis review applies or not, *Flores* sends a very strong signal from the Supreme Court that the majority errs in failing to defer to the government's mental healthcare choices in this case.

At a minimum, Fourth Circuit precedent makes clear that the deferential deliberate indifference standard should apply in this case. In *Patten v. Nichols*, 274 F.3d 829 (4th Cir. 2001), we established three factors to determine whether the professional judgment standard should apply. Contrary to the majority's view, all three factors favor application of the deliberate indifference standard. The most important factor is the purpose of the

45

detention. *Id.* at 840. The professional judgment standard is appropriate only for someone detained for a rehabilitative purpose. Thus, we have applied the professional judgment standard to a sexual predator treatment program, *Christian v. Magill*, No. 17-7025, 724 Fed. Appx. 185 (4th Cir. 2018), and to the Federal Bureau of Prisons' Commitment and Treatment program. *Matherly v. Andrews*, 859 F.3d 264, 274–76 (4th Cir. 2017). But in this case, the purpose of Doe's detention is not rehabilitative. He was transferred to SVJC because he was dangerous, having had nine behavioral incidents at his previous facility. Because of his violent actions toward staff members and other children, he could not be safely housed in a less secure detention facility. SVJC tried four times to transfer Doe to facilities designed to provide more robust mental health treatment, but those facilities would not take him because he was a threat to those around him. *See* J.A. 883-84. SVJC was therefore detaining Doe not to rehabilitate him, but to protect him and other children.

The majority rejects this straightforward conclusion by insisting that safety and rehabilitation are not mutually exclusive. Maj. Op. at 25–26. That *ipse dixit* assertion is belied by the choices the States and the Office of Refugee Resettlement have made in designing a juvenile detention system. Some facilities, like SVJC, are specifically designed to deal with the most dangerous minors in the system. These facilities face overwhelming practical challenges, including the necessity of preventing violence against other detainees or staff and protecting children from self-harm. The majority's insistence that SVJC is capable of prioritizing things other than safety is not substantiated by any practical experience or expertise. And it is belied by the fact that policymakers found it prudent to create a facility designed to house particularly dangerous juveniles.

Second, we must examine the nature of the confining facility. *Patten*, 274 F.3d at 841. SVJC is not a hospital. It is not a residential treatment center or other therapeutic setting. SVJC does not employ specialized medical personnel and SVJC is not required to do so under its contract with the Office of Refugee Resettlement. *See* J.A. 137-40. SVJC relies on third-party providers for most mental healthcare needs, including formal diagnoses and medical prescriptions. As a juvenile detention facility, SVJC is not equipped or staffed to provide the type of mental health services available in a residential treatment center or psychiatric hospital. *Patten's* second factor thus clearly militates against the professional judgment standard, reflecting the practical wisdom that courts should not use vague constitutional ideals to force government facilities to fundamentally alter their mission.

The third *Patten* factor focuses on the duration of the detention, recognizing that the deliberate indifference standard is more appropriate when temporary detentions are at issue. *Patten*, 274 F.3d at 841. SVJC only detains unaccompanied alien minors like Doe temporarily. The Office of Refugee Resettlement reviews the placement of unaccompanied alien minors every thirty days and is charged with keeping them at the least secure facilities possible. *See* 45 C.F.R. § 410.203(c)–(d). Reassignment is premised upon thirty days of good behavior without violent incidents, and it is not based on treatment goals. *See id*. Doe is thus quite unlike the involuntarily committed patient in *Youngberg,* who faced life-long detention and dependence on the government.

Other courts have likewise concluded that the deliberate indifference test governs claims of inadequate medical care by juveniles detained for non-rehabilitative purposes.

47

The majority begrudgingly acknowledges that the weight of out-of-circuit authority is against it, failing to cite a single case finding the professional judgment standard applicable in a similar case. Maj. Op. at 28-29. For example, recognizing that substantive due process doctrine has traditionally been cabined to bar only behavior that "shocks the conscience," the Third Circuit has adopted the deliberate indifference test to evaluate claims by juvenile detainees. *See Luzerne Cty. Med. Ctr.*, 372 F.3d at 579. By concluding otherwise the majority, as noted, needlessly creates a circuit split.

In short, there is no support for the majority's expansion of the professional judgment standard in Supreme Court, Fourth Circuit, or out-of-circuit precedent. And of course, the majority does not even attempt to argue that constitutional text supports its move. Instead, it ignores the Supreme Court's command to "exercise the utmost care" before "break[ing] new ground" in substantive due process doctrine. *Glucksberg*, 521 U.S. at 720. A deliberate indifference standard is much more faithful to that edict.

B.

In addition to the doctrinal problems with the majority's decision, there are practical problems as well. First, as noted, it forces judges to evaluate what constitutes effective mental health treatment, something we are utterly unqualified to do. We are not medical professionals. We are not psychiatrists with long educational and experiential training in mental health. We know far less about mental health than any of the four medical professionals that treated Doe. The Supreme Court has repeatedly cautioned that judges do not have even the necessary expertise to second-guess institutional governance decisions made by prison administrators. *See, e.g.*, *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)

48

(explaining that "courts are ill equipped to deal with the" "complex and intractable" "problems of prison administration," which "are not readily susceptible of resolution by decree"). If we are not competent to tell prisons how to operate, how are we capable of telling psychiatrists how to do their jobs?

The majority itself demonstrates the drawbacks of the professional judgment approach. The plaintiff in this case invites us—judges with no medical training—to adopt the "trauma-informed" approach to mental health care treatment. He tells us that "[t]he approach, in essence, is designed (1) to screen, assess for and treat the consequences of prior trauma; and (2) to avoid correctional practices that retraumatize juveniles." Appellant Brief at 35 (internal quotation marks omitted). He further advises us that the trauma-informed approach "achieves those objectives through treatment geared to addressing the experienced trauma and through implementation of detention practices that include ensuring that all staff understand how to recognize the signs of past trauma and to avoid exacerbating trauma through punishment-based responses." *Id.* In accepting this strategy, we are asked to overrule the medical strategy adopted by Dr. Kane, Dr. Gorin, and Doe's two clinicians. We are told to ignore Dr. Gorin's diagnoses, the medication prescribed, the regular meetings with a psychiatrist, and the anger counseling given by the clinicians. We are instructed to ignore Doe's own testimony that this treatment was effective at helping plaintiff control his anger. J.A. 873. We are advised, as though we were public health agencies or legislative committees or anyone with a background in this area, to mandate a new, innovative approach to mental healthcare.

49

The majority accepts this invitation, delving into scientific literature and cherry-picking the testimony it likes from the record. *See, e.g.*, Maj. Op. at 33–36. It prefers the testimony of Dr. Lewis, the expert hired by Doe for this litigation, over that of Dr. Kane, the psychiatrist who actually treated Doe. *See, e.g.*, Maj. Op. at 33–34 (crediting Dr. Lewis's testimony but ignoring Dr. Kane's). The majority also relies on the fact that twelve states—hardly an overwhelming number—have implemented the trauma-informed approach. Maj. Op. at 35. But in what form and to what effect these states have acted we have no idea. Apparently the other thirty-eight States lack the majority's wisdom. Finally, we are treated to reports from various advocacy groups, experts, and the Department of Justice from a prior administration pushing the trauma-informed approach to mental healthcare. Maj. Op. at 34–35. The majority does not tell us how it chose these various sources, and that is of course quite telling. But even if the majority is correct that certain advocacy groups favor its approach, such organizational reports "simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979).

Is the majority correct that the trauma-informed approach is the best approach to mental healthcare? Maybe; maybe not. I have no idea. I am neither a psychiatrist nor a legislator. We have not assembled a representative array of experts and medical professionals. We have conducted no committee hearings. We have not assessed the institutional setting or determined this detainee's suitability for the course of treatment we now prescribe. We have not in short balanced costs and benefits. Nor should we. "The calculus of effects, the manner in which a particular [policy] reverberates in a society" is

50

"not a judicial responsibility." *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979). There was once a time, I suppose, for Renaissance judges as there was for Renaissance men and women, but leaps in medical science ought to induce in judges a certain modesty and inhibition. The representative and policy-making branches of our government are in a far better position to consult with medical professionals and decide what preferred mental healthcare looks like than we are.

The heart of the majority's argument is that we judges should second-guess Doe's psychiatrist, psychologist, and clinicians because children are involved. Maj. Op. at 29 ("Notably, neither the Commission nor the district court grapple with the fact that this case is about children."). It is more accurate, of course, to say the case is about juveniles, since a detention facility for the most dangerous would have no need to detain young children. It is telling, moreover, that the cases cited by the majority arise in completely different legal contexts—mostly Eighth Amendment claims concerning the death penalty and other permissible sentences, *see* Maj. Op. at 29-30—and they do not support extending substantive due process in this case. I fail to see why or how our utter lack of qualifications to make mental healthcare decisions is improved by the fact that juveniles are involved. If anything, child mental healthcare is even more complex and even further beyond judicial cognizance.

The majority's decision likewise interferes with the constitutional power of States to design their juvenile detention systems. The Supreme Court has explained that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures than the administration of

51

its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973)). States have a similarly strong interest in being able to design and manage their juvenile detention systems in a manner free from federal judicial fine-tuning. Thus, "institutional reform" cases like this one "often raise sensitive federalism concerns." *Horne v. Flores*, 557 U.S. 433, 448 (2009).

How much is all this going to cost? And from whose pocket is the money for our prescriptions going to come from? The majority will not say. Money is always a scarce commodity in state finance, given that states are usually required to balance their budgets under law. *See* David A. Super, *Rethinking Fiscal Federalism*, 118 Harv. L. Rev. 2544, 2592 (2005). It is not as though there is any absence of needs. Better schools and universities. Improved roads. Safety net health and welfare outlays. Pressing correctional expenditures. So often these institutional reform suits seem nothing so much as an attempt to move a preferred funding request to the head of the line. *See Horne*, 557 U.S. at 448 ("States and local governments have limited funds. When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs."). But it is the essence of the legislative process to *weigh* some needs against others, a process the majority is all too content to pass by.

Blasting past federalism concerns, the majority also strips SVJC of its autonomy. It must now likely spend substantial sums to hire new medical professionals well versed in the form of healthcare that courts are willing to approve. But that is not all. The majority's decision will likely force a complete redesign of juvenile detention systems. Some juvenile detention facilities, like SVJC, are secure facilities, which means they are specifically

designed to house juvenile detainees that cannot be safely placed at other facilities because they are dangerous. 45 C.F.R. § 411.5 (defining a "secure facility," like SVJC, "as the most restrictive placement option for [an alien minor] who poses a danger to him or herself or others or has been charged with having committed a criminal offense"). Indeed, SVJC is one of just three facilities nationwide specially designed to deal with dangerous immigrant juveniles. *See* J.A. 30. Other facilities are designed with a rehabilitative purpose. Indeed, SVJC tried on multiple occasions to send Doe to such rehabilitative facilities, but they would not take him because he was too dangerous. *See* J.A. 883-84. The majority's decision effectively requires all juvenile detention facilities to adopt rehabilitative mental health treatment and to refrain from imposing any sanctions someone might regard as strict, because that would reawaken some past traumatic episode. But the calibration of discipline is fruitfully left to those actually on the scene. It is best to leave facilities flexibility in gauging when stern measures might be necessary and when they might prove decidedly counterproductive.

This all foreshadows a dramatic change from present practice. No longer is the dichotomy between rehabilitative and non-rehabilitative juvenile detention—the latter likely adopted to keep most children safe from the most dangerous children— constitutionally permissible. But never fear. The majority apparently believes that such dramatic changes to the States' juvenile detention systems are wise. It believes that we federal judges, and not the States retaining the police power in our federalist system, know best, notwithstanding the fact that all correctional systems, state and federal, classify and administer facilities according to the degrees of dangerousness of the populations therein.

53

To repeat: adopting the professional judgment standard thrusts the courts into ongoing oversight roles they are ill-suited to perform. Every decision by a medical professional at SVJC can now be second-guessed by a court, and we can expect to see more cases arising from detention facilities as litigants continue to dispute what the best course of mental health treatment for institutions and individual residents is. This cycle has played out in other contexts. For several decades, courts around the country used constitutional provisions to micromanage conditions at prisons, encouraging litigants to initiate yet more "institutional reform litigation." *See* Laycock & Hasen, *supra*, at 324. After entering a judgment against an individual facility for a violation, courts found themselves supervising the same institutions for decades. And that supervision led to an endless series of remedial orders governing everything from the number of bunks in a room to the design of prison libraries.

After seeing the deleterious effects of these interventions, the Supreme Court decided a series of cases intended to end them. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343 (1996) (reversing injunction dictating when prison library needed to be open, setting qualifications for prison librarians, and requiring the creating of a legal-research course for inmates); *Rhodes v. Chapman*, 452 U.S. 337 (1981) (reversing district court's injunction against placing two inmates in a cell and cautioning courts not to impose their own policy preferences on prisons). The same dynamic played out in schools, as judges would oversee schools for decades in the name of enforcing constitutional provisions. *See* Laycock and Hasen, *supra*, at 224–25. But the Supreme Court "lost patience" with these efforts in the late 1990s and shut them down as well. *Id.* at 326; *see Missouri v. Jenkins*, 515 U.S. 70

54

(1995) (calling for an end to eighteen years of judicial supervision over the Kansas City School District that resulted in the ordered expenditure of hundreds of millions of dollars, the renovation of facilities, and the hiring of new personnel). Now the majority opens a new front of judicial institutional supervision, ignoring our own court's recent warning against this. *See Matherly*, 859 F.2d at 275–76 ("[T]he Supreme Court has made clear that the judiciary should not be in the business of administering institutions."). All these interminable interferences began with what the majority undoubtedly sees as some innocuous initial step. But the undertow is strong. Hopefully judges will not have to micromanage juvenile mental healthcare for decades before the Supreme Court steps in.

## II.

Even under the majority's erroneous professional judgment standard, we should affirm the district court. Although it is hard to discern from reading the majority's opinion, the Supreme Court bent over backwards to emphasize that the professional judgment standard is highly deferential. The professional judgment standard requires only that a court confirm "that professional judgment in fact was exercised" rather than specifying "which of several professionally acceptable choices should have been made." *Youngberg*, 457 U.S. at 321. This is so because the Supreme Court understood that judges are not well-equipped to second-guess medical decisions. *See id.* And we have stated that "the proper inquiry is whether [a treatment] decision was so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." *Patten*, 274 F.3d at 845. Professional judgment "does not mean some standard employed by a reasonable expert or a majority of experts in the community . . . but rather that the choice in question was not a sham or

otherwise illegitimate." *Id.* Decisions by mental healthcare providers have a "presumption of validity." *Id.*

Instead of focusing on what treatment SVJC actually provided to Doe, the majority wades through advocacy presentations and plucks evidence to endorse the trauma-informed approach to mental health treatment. Not only is this doctrinally improper, but it fails to show proper respect for the medical professionals who treated Doe.

A review of the record makes clear that SVJC's mental health providers exercised professional judgment in dealing with Doe. Before Doe arrived at SVJC, he was placed at the Children's Village, a non-secured facility in New York. Because he had nine behavioral incidents there and his behavior posed a clear threat to himself and other children, he was moved to SVJC because it was a secure facility designed to house juveniles who posed a threat to those around them. Upon arrival, Dr. Joseph Gorin, a psychologist retained by SVJC, examined Doe. As a result of this examination, Gorin diagnosed Doe with Attention Deficit Hyperactivity Disorder (ADHD) and Post-Traumatic Stress Disorder (PTSD). J.A. 894.

While Doe resided at SVJC, he received extensive mental health treatment that focused on the conditions diagnosed by Dr. Gorin and on his well-documented anger problems. Doe regularly met with Dr. Kane, a licensed psychiatrist. In response to Dr. Gorin's original diagnosis, Doe was prescribed medication for ADHD and PTSD. Doe's medical records reflect twelve visits with Dr. Kane from December 2017 through September 2018. J.A. 964–99. SVJC never denied a request by Doe to see Dr. Kane. And these were not just *pro forma* visits. Dr. Kane's treatment records regarding Doe show that

on each visit he obtained an updated patient history and reviewed any symptoms displayed by Doe. J.A. 964–99. According to Doe's own testimony, Dr. Kane routinely asked how he had been doing since his last appointment and whether Doe had experienced any issues with sleeping, anger, anxiety, or other feelings. J.A. 850. Dr. Kane also provided counseling to Doe on risk reduction, affective mood instability, and anxiety. J.A. 683–843.

Doe also received mental health treatment from two clinicians, Andrew Mayles and Evenor Aleman, who were both licensed professional counselors with master's degrees and who had each completed at least 3,400 supervised clinical hours. J.A. 881. The primary focus of these clinicians was to help control Doe's anger problems. This was sensible because Doe was involved in multiple violent incidents while at SVJC, including one occasion where he punched a wall. Doe also repeatedly attempted to harm himself. J.A. 2014. And he repeatedly punched staff members in the face. J.A. 1000–01, 1010–11. Further, Doe approached another minor from behind and choked him. J.A. 2160. But Doe's clinicians took consistent and proactive steps to prevent Doe from hurting himself during these incidents, and they succeeded except for the instance where Doe punched a wall. Doe himself testified that his anger management improved while he was at SVJC. J.A. 873.

And SVJC tried to transfer Doe to a residential treatment facility where he could have received additional mental health care. *See* J.A. 883-84.  But these other facilities would not take him because he posed a threat of violence, as evidenced by his multiple violent incidents at SVJC. In an ideal world, every juvenile detention center would be fully outfitted to provide optimal mental health treatment. But the Constitution does not permit judicial implementation of a perfect world because "[t]he problems of government are

57

practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. City of Chicago*, 228 U.S. 61, 69–70 (1913). But I cannot begin to say that SVJC's approach is illogical. We live in a world where some juveniles are especially dangerous, and it makes sense that some facilities like SVJC are designed to prioritize safety and control violent behavior.

The majority apparently believes that the treatment decisions made by the mental health professionals who treated Doe deserve no deference. While largely ignoring the efforts they made, it instead privileges Doe's expert, Dr. Lewis, to insist they should have made different treatment choices that focused on rooting out the underlying causes of alleged past trauma. Maj. Op. at 33–34. But even Dr. Lewis acknowledged that Doe's clinicians made efforts to "appropriately respond to [Doe]," only claiming they didn't "go far enough." J.A. 226. But Dr. Lewis did not observe these clinicians or even meet with them. In contrast, Dr. Kane worked with these same clinicians regularly, and he testified at length about the sufficiency of their efforts. J.A. 672–77. Dr. Lewis's testimony evidences only a professional disagreement with medical decisions made by professionals. That is not enough to overcome the presumption of validity owed to the decisions made by Doe's mental health providers. And it is not enough to survive summary judgment under the professional judgment standard, which permits us only to ensure "that professional judgment in fact was exercised" rather than specifying "which of several professionally acceptable choices should have been made." *Youngberg*, 457 U.S. at 321. The fact that the majority surges forward in the face of such a record speaks volumes about all that lies in store.

III.

Judges are not psychiatrists. Mental health, while highly desirable for all, is a complex and evolving field. For good reasons, mental health professionals must go through a rigorous course of education and licensure before entering their important practice. This is no place for judicial amateurs whose far wanderings from our founding document spell only confusion. By wading into this complex field without textual support, judges will find themselves adrift in a sea of vast debate on a subject whose depths we cannot plumb and do not comprehend. Because the majority's decision is legally unmoored and practically unworkable, I respectfully dissent.